**Richard E. ECKERD, Plaintiff,**

v.

**INDIAN RIVER SCHOOL DISTRICT et al., Defendants.**

**Civ. A. No. 77–198.**

United States District Court, D. Delaware.

Aug. 29, 1979.

Sheldon N. Sandler, Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

John A. Sergovic, Jr., Tunnell & Raysor, Georgetown, Del., for defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

The plaintiff in this action, Richard E. Eckerd, was a tenured teacher employed for

eight years as a music instructor for the Indian River School District. At the end of the 1976–77 school year, Mr. Eckerd was notified that he was being discharged for "willful and persistent insubordination," within the meaning of the Delaware teacher termination statute, 14 *Del.C.* § 1401 *et seq.*[1] He requested a hearing before the Indian River Board of Education, in accordance with his rights under 14 *Del.C.* § 1413, and, after the hearing, the Board confirmed the plaintiff's discharge. Mr. Eckerd has sued the School District, the Board of Education, and the individual members of the School Board (in their individual and representative capacities), alleging that the termination violates his substantive and procedural rights to due process, as well as his First Amendment right to free speech. Furthermore, plaintiff contends that because he was not guilty of willful and persistent insubordination, his discharge violates the provisions of the Delaware teacher termination statute, as well as his rights under the collective bargaining agreement between the Indian River Board of Education and the Indian River Education Association. The merits of Mr. Eckerd's claims were tried to this Court on January 8–10, 1979, and post-trial briefs were subsequently filed. Oral argument was held on May 1, 1979, and thereafter supplemental briefing was permitted. This opinion constitutes the Court's Findings of Fact and Conclusions of Law as required by Rule 52 of the Federal Rules of Civil Procedure.

I. *BACKGROUND FACTS*

The plaintiff began his employment with the Indian River School District in the fall of 1969, when he was hired as a music instructor and assigned to the Selbyville Middle School. Two years later he was transferred to Indian River High School, where, until his discharge in the spring of 1977, he served as a music instructor with responsibilities for the school's band and choral music programs. The problems upon which the Board relied to justify Mr. Eckerd's termination apparently began in the fall of 1974,[2] and led to a deteriorating relationship between the plaintiff and his immediate supervisor, Mr. Elmer R. Knowles, principal of the Indian River High School. The evidence adduced at trial indicated that by November, 1976 Mr. Knowles had informed the plaintiff of his intention to document Mr. Eckerd's unsatisfactory performance at every opportunity and to recommend his termination.[3] Such a recommendation was indeed made at the end of that school year and forwarded to the Board of Education, which sent Mr. Eckerd a letter dated March 24, 1977 informing him of the Board's intent to terminate his services effective June 30, 1977.[4] The letter told Mr. Eckerd that he was being terminated for "willful and persistent insubordination," and it explained that he could request a hearing before the Board within ten days after receipt of the letter. Mr. Eckerd indeed requested such a hearing, which was scheduled for April 18, 1977.[5] He thereafter requested a continuance of the hearing,[6] which was denied on the grounds that 14 *Del.C.* § 1413 mandates that the hearing be held within 21 days after the date of receipt

---

1. 14 *Del.C.* § 1411 provides:
   Termination at the end of the school year shall be for 1 or more of the following reasons: Immorality, misconduct in office, incompetency, disloyalty, neglect of duty, willful and persistent insubordination, a reduction in the number of teachers required as a result of decreased enrollment or a decrease in education services. The board shall have power to suspend any teacher pending a hearing if the situation warrants such action.

2. See Plaintiff's Exhibit 2 (PX 2), at Administration Exhibit 2. PX 2 is all exhibits introduced at Mr. Eckerd's termination hearing before the School Board and contains Administra-

tion Exhibits and Teacher Exhibits. References to PX 2 hereinafter will appear as PX 2(A_) or PX 2(T_). PX 2(A2) is a letter dated October 9, 1974 and is apparently the earliest reprimand of plaintiff of which the School Board was made aware.

3. Trial Transcript, Volume A, at 42(A–42).

4. PX 2(T9).

5. PX 3.

6. PX 4.

of a written request for hearing.[7] The Board apparently concluded that Mr. Eckerd did not have the power to waive this time limit. Prior to the hearing, plaintiff's counsel, Sheldon N. Sandler, requested that the Board provide him with a·more detailed notice of the charges against Mr. Eckerd, along with an explanation of the evidence that would be presented in support of these charges, and the names of witnesses expected to testify on behalf of the Administration.[8] Although this request was forwarded to the attorney who presented the case on behalf of the Administration at the public hearing,[9] the information requested was not provided prior to the scheduled hearing.

Mr. Eckerd's hearing convened as scheduled on April 18, 1977. Appearing on behalf of the plaintiff, Mr. Sandler initially requested an opportunity to conduct a voir dire of the Board members in order to determine whether any of them had previous knowledge of the charges against Mr. Eckerd or evidenced any bias against his position.[10] The Board's chairman, Chester V. Townsend, III, declined to permit the voir dire but merely asserted that the Board would hear the evidence impartially.[11] He gave each member of the Board an opportunity to recuse himself from participating in

the proceedings, and none did so.[12] Thereafter, the Board of Education called its only witness, Mr. Knowles, whose direct testimony consumed the entire first session of the hearing. A second session was scheduled for April 25, 1975, and at that time Mr. Sandler was permitted to cross-examine Mr. Knowles and to call witnesses on Mr. Eckerd's behalf. Throughout the two evenings of hearing, the Board was advised by attorney William Swain Lee, and Mr. Lee also participated in the Board's executive session at which the final decision to terminate Mr. Eckerd was reached.[13] After the close of the hearing, but prior to the executive session, counsel for the Administration and Mr. Eckerd were permitted to file briefs in support of their positions.[14]

Shortly after the second evening of hearing, the Board met in executive session and discussed the evidence that had been presented to them. Mr. Lee attended in an advisory capacity but did not advance his opinion as to whether the termination should be confirmed,[15] and Superintendent Proudfoot, along with administrative assistant Graham Dill, attended in a nonparticipatory capacity.[16] At the end of the meeting, a majority of the members of the Board in attendance voted to terminate Mr.

7. PX 5.

8. PX 6.

9. PX 7. An unfortunate confusion of roles is evidenced by the letter informing Mr. Eckerd's attorney of this referral. James M. Proudfoot, in his capacity as Secretary of the Board of Education, informed Mr. Sandler by letter dated April 18, 1977 that his request had been "forwarded to our Attorney, Mr. John A. Sergovic." By use of the word "our," Mr. Proudfoot apparently intended to describe Mr. Sergovic as the Board's attorney, and indeed the firm of which Mr. Sergovic is a member had frequently served as counsel to the Indian River School Board. (Defendant's Exhibit 2, at 22–24) Mr. Proudfoot, however, was also the Superintendent of the Indian River School District, and was therefore the senior member of the Administration that had brought the charges against Mr. Eckerd. Furthermore, Mr. Sergovic served as the Administration's advocate in the hearing before the Board and submitted briefs in support of the Administration's position. Thereafter, however, he prepared the Board's written decision to terminate Mr. Eck-

erd (PX 13) and subsequently served as the Board's attorney in the present lawsuit. To compound the confusion, Mr. Proudfoot and W. Graham Dill, an administrative assistant to the School District, both sat in on the executive session in which the final decision to terminate Mr. Eckerd was reached (B–16). Although they apparently did not participate in the decision-making process, the necessity for the presence of Administration representatives at this meeting remains unexplained.

10. PX 1, at 6–12 (PX 1 is the transcript of the plaintiff's hearing before the School Board.)

11. *Id.* at 8, 10.

12. *Id.* at 10–12.

13. C–6.

14. PX 8, 9 and 10.

15. C–8, 16–19.

16. B–101, 114.

Eckerd but did not consider or agree upon a specific list of factual findings in support of their decision.[17] Mr. Lee was asked to prepare a written decision, but he declined to do so because of his pressing work load and urged the Board to write a short decision themselves.[18] The task, however, was assigned to Mr. Sergovic, attorney for the Administration, who never consulted with the Board before drafting the decision that was ultimately issued.[19] Rather, he spent approximately one and one-half hours consulting with Mr. Dill about the evidence adduced in the hearings, and then drafted a document containing nine findings of fact, which was adopted without change as the Board's decision.[20]

In its findings of fact,[21] the Board concluded that Mr. Eckerd violated known school district policies concerning attendance at pre-announced faculty meetings, attendance of the band at all scheduled or rescheduled football games, reporting of failing grades, deposits of school monies received by a teacher, security of equipment storage areas, and participation of band students in regular band activities. The decision also concluded that Mr. Eckerd had disobeyed specific directives from his superiors to provide a list of students taking part in the County Chorus program. Finally, the last finding of fact held that:

> Written responses of Mr. Eckerd to numerous memoranda written by the Administration to notify Mr. Eckerd to follow specific directives and/or general rules and policies of the district indicate: (a) that Mr. Eckerd was critical of the Administration, and (b) that Mr. Eckerd exhibited a defiant attitude toward his immediate supervisors, the supervisory staff of the Indian River School District and the Indian River Board of Education.[22]

The details of these findings, along with the specifics of the evidence introduced at the Board hearing in support of them, will be discussed more fully in connection with the disposition of the plaintiff's claims, to which the Court now turns its attention.

## II. CLAIMS PRESENTED

■ As previously noted, the plaintiff challenges the propriety of his termination on a variety of federal constitutional and state law grounds. Before addressing the merits of these claims, it is necessary for the Court to dispose of the defendants' contention that the state law questions should not be considered, and to determine the order in which the claims are to be adjudicated. The plaintiff urges that his claims under the Delaware teacher termination statute[23] and under the collective bargaining agreement then in effect[24] are cognizable by this Court under the doctrine of pendent jurisdiction. Plaintiff's claims all arose from a common nucleus of operative fact and were amenable to efficient trial in a single proceeding. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Indeed, the testimony and documentary evidence relevant to the state law claims were almost coterminous with that bearing on the federal constitutional claims, and because the questions were to some degree intertwined, a separate trial on the state and federal claims would have been extraordinarily wasteful. Furthermore, as will presently become apparent, the Court considers the federal claims raised by the plaintiff to be substantial ones that independently support federal jurisdiction and that are not raised as a mere stratagem to acquire federal jurisdiction over the state law questions. The defendants' citation to *Trivits v. Wilmington Institute,* 417 F.Supp. 160 (D.Del.1976), *rev'd,* 574 F.2d 739 (3d Cir. 1978), is inapposite. In *Trivits* the district court dismissed

---

**17.** C–25.

**18.** C–10–11.

**19.** PX 13.

**20.** B–17–19, PX 13.

**21.** PX 11.

**22.** PX 11, finding 9.

**23.** 14 *Del.C.* § 1401 *et seq.*

**24.** PX 12.

the state law claims because they were based on a different factual complex than the constitutional claims and because (even assuming that the court had power to decide them) the federal claims were considered too insubstantial to support the exercise of pendent jurisdiction.

■ Having concluded that it has jurisdiction over Mr. Eckerd's claims under the union contract and under the Delaware teacher termination statute, the Court nevertheless must decline to base its grant of relief to this plaintiff on the state law grounds. Although it is axiomatic that a federal court should refrain from reaching and adjudicating constitutional questions when the relief sought by a plaintiff can be granted on statutory grounds,[25] all of the relief sought by Mr. Eckerd could not be granted by an adjudication confined to the non-constitutional claims. Judicial remedies for an improper discharge under the Delaware teacher termination statute are expressly limited to the award of back pay and reinstatement,[26] and therefore the plaintiff's prayers for damages to compensate for his lost business opportunities and for his emotional distress could not be granted under the teacher termination statute. Decision of the State statutory claim would not, therefore, obviate the necessity of reaching Mr. Eckerd's constitutional claims. Furthermore, the Delaware statutory scheme anticipates that school board decisions to terminate teachers should be renewed by the Delaware Superior Court.[27] Under the circumstances of the present case, this Court declines to usurp the State courts' function. As recognized in *Gibbs, supra* :

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by

procuring for them a surer-footed reading of applicable law.[28]

■ Adjudication of Mr. Eckerd's claim based on the collective bargaining agreement between the Indian River School District and the Indian River Education Association will also be declined. Plaintiff apparently bases his claim for contractual relief upon Articles IV K.2. and XIII D. of the contract, which provide that teachers shall be permitted to comment in writing upon administrative evaluations and other material in their personnel files. In briefing and argument, however, the plaintiff's reference to these provisions was used to buttress his First Amendment argument, by demonstrating that the School Board had contractually approved teacher comments and could not therefore be heard to claim they were disruptive or inherently insubordinate. Article XVIII A. of the agreement also guarantees that teachers employed by the Indian River School District will not be dismissed for arbitrary or capricious reasons. Plaintiff's failure to make any argument based on this provision supports the conclusion that the contractual claims raised in the complaint were not pressed at trial. Under the circumstances, the contractual questions are viewed as not properly posed for decision.

Attention is now turned to plaintiff's federal constitutional claims, which assert a violation of Mr. Eckerd's First Amendment right to freedom of speech and a deprivation of both procedural and substantive due process. Because it is concluded that plaintiff's claims for relief, to the extent his damages have been proved to a reasonable certainty, may be fully granted on the basis of a finding of a First Amendment violation, the Court deems it unnecessary to

---

**25.** See *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J. concurring); *Siler v. Louisville & Nashville R. Co.,* 213 U.S. 175, 191, 29 S.Ct. 451, 53 L.Ed. 753 (1909).

**26.** 14 *Del.C.* § 1414.

**27.** *Id.*

**28.** 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted).

The teachings of *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), which required the adjudication of a pendent claim, are not to the contrary. In *Hagans,* the pendent claim was a *federal* claim not subject to federal jurisdiction on the basis of jurisdictional amount, and its adjudication could avoid decision of a constitutional claim.

adjudicate the remaining due process claims.[29]

### III. THE FIRST AMENDMENT VIOLATION

In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the United States Supreme Court made it clear that a teacher's employment by a public school system may not be conditioned upon the relinquishment of First Amendment rights to freedom of speech. Free expression cannot be curtailed absent some countervailing interest of the school board that outweighs the teacher's free speech interest. When activity found to be protected under the *Pickering* balancing test is a substantial or motivating factor in the discharge of a public employee, a prima facie First Amendment violation is established and the burden shifts to the defendant to prove that the employee would nevertheless have been discharged if the employer had not considered the protected activity. *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). There can be little question in the present case that Mr. Eckerd's expressions of opinion played a substantial role in the decision to terminate him. The Board's ninth finding of fact expressly referenced the plaintiff's criticism of the administration and his defiant attitude, as reflected in his written responses to memoranda from his superiors. Mr. Lee, who advised the Board at the hearing and who was present at its deliberative session, specifically testified that "[h]is attitude, I think, was the key thing," [30] and it is clear from a review of the evidence adduced both at the hearing and at the trial that the plaintiff's attitude was demonstrated almost exclusively by his written and spoken words. The testimony of Board member Charles Hill Mitchell also confirms the importance that the Board ascribed to Mr. Eckerd's attitude.[31]

The defendants, indeed, do not seriously contend that Mr. Eckerd's expressions of opinion did not significantly affect the Board's decision to terminate him, but rather argue that (1) because these expressions were communicated privately and involved matters not touching the public interest, they should be afforded little or no constitutional protection; and (2) Mr. Eckerd's interest in free expression is outweighed by the School Board's need to assure the efficient and orderly delivery of the public services it renders. In a decision issued during the trial of the case presently at bar, the United Supreme Court in large measure disposed of defendants' first argument. In *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Court considered the dismissal of a teacher who had engaged in a series of private encounters with her school principal in which she vociferously criticized the policies and practices of the school district, which she viewed as racially discriminatory. The court wrote:

> The First Amendment forbids abridgment of the "freedom of speech." Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment.[32]

*Givhan* thus establishes that the private context of Mr. Eckerd's speech did not automatically remove it from the protections of the First Amendment.[33] Defendants, however, urge that the content of the plaintiff's comments was of such minimal interest to

---

**29.** As will become apparent in part IV, *infra*, plaintiff's state law claims are to some degree bound up in the adjudication of the First Amendment question.

**30.** C–22; see also C–15–16.

**31.** See B–125–26.

**32.** at 415–416, 99 S.Ct. at 696–697.

**33.** *Accord, Roseman v. Indiana University of Pennsylvania*, 520 F.2d 1364 (3d Cir. 1975), in which the Third Circuit held (prior to the Board hearing in this case) that a teacher's interests in private communications might have less weight in the *Pickering* balance than an interest in public speech, but that a balancing was nonetheless appropriate.

the public as to place them outside the scope of First Amendment protection.

■ Under *Pickering* and its progeny, the Court is required to evaluate the limits of a teacher's First Amendment protection by balancing the public employee's interest in freedom of expression against the employer's interest in running an efficient and effective school district. While the content of allegedly protected speech may bear on the degree of interest a teacher may properly claim in his First Amendment freedom, there is no indication from the cases that speech not relating to burning social issues may automatically be excluded from protection. In the present case, the Court concludes that the *Pickering* balance tips in favor of the plaintiff. Among the comments that were brought to the Board's attention in Mr. Eckerd's termination hearing were ones relating to attendance of the high school band at rescheduled football games,[34] district grading policies and practices,[35] and involvement of band members in the full panoply of musical activities.[36] These subjects must be viewed as at least as topical as the teacher dress code issue that the Court found to be protected in *Mt. Healthy, supra,*[37] and they were likely to affect a substantial number of students as well as the public image of the Indian River High School band. Furthermore, the comments that Mr. Eckerd made concerning these issues, and virtually all of the other issues upon which he expressed an opinion, involved matters for which the plaintiff had a high degree of responsibility and, in some cases, a specialized expertise. His comments were not offered gratuitously, but were rather made in response to criticisms from Mr. Knowles, his principal, and in each case they related to the performance of the plaintiff's job as band and choral director. The validity of a teacher's interest in expressing his or her opinion on such matters is particularly demonstrable under the circumstances of this case, for the right to comment on evaluations and other materials placed in one's personnel file is expressly guaranteed by two provisions of the collective bargaining agreement that governed Mr. Eckerd and his fellow employees.[38] Under the circumstances of this case, the Court cannot view as insubstantial the plaintiff's interest in commenting upon the principal's unfavorable evaluation of plaintiff's performance of his assigned duties, particularly where Mr. Eckerd believed that the evaluations were unwarranted, authored in bad faith, and endangered his job.[39]

■ The *Pickering* balance, of course, recognizes that a teacher's interest in free expression may be reasonably curtailed where it "impede[s] the teacher's proper performance of his daily duties in the classroom," where it undermines the discipline of immediate supervisors, or where a teacher's criticism threatens "close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering, supra,* 391 U.S. at 569–70, 572–73, 88 S.Ct. at 1735, 1737. The Board has introduced absolutely no evidence in this case that Mr. Eckerd's expressions of opinion in any way adversely affected his performance in the classroom or in his capacity as music teacher. Mr. Eckerd's comments were delivered privately and in no way disrupted relationships to students or other faculty members. Although it is clear that the relationship be-

---

**34.** PX 11, finding 2.

**35.** *Id.* finding 3.

**36.** *Id.* finding 8.

**37.** The Court notes that one of the issues that reached Board member Mitchell's attention, but was not encompassed by the Board's nine Findings of Fact, involved an exchange between Mr. Mitchell and Mr. Eckerd concerning the latter's failure to wear a coat and tie to a band performance. After Mr. Mitchell ex-

pressed his disapproval at the plaintiff's dress, Mr. Eckerd sent a letter directly to Mr. Mitchell communicating his disagreement with the Board member's conclusions. Mr. Mitchell deemed this form of communication improper. B–126–37.

**38.** PX 12, Art. IV.K.2. and XIII.D.

**39.** See A–42.

tween Mr. Knowles and Mr. Eckerd deteriorated over the course of his last three years of employment, the evidence demonstrates that in each case where Mr. Eckerd expressed his disagreement with Mr. Knowles' directives, the plaintiff nevertheless complied with them.[40] Neither can the Court characterize the relationship between Mr. Knowles and Mr. Eckerd as one requiring the maintenance of "personal loyalty and confidence." Mr. Eckerd's duties were performed in the context of a large and diversified senior high school, and his job required him to apply his own specialized expertise to the direction of a music program over which the school principal could and did exercise only a limited amount of day-to-day control. The defendants' contention that the plaintiff's attitude, as expressed in his responses to Mr. Knowles criticisms, undermined his principal's discipline and ability to direct Mr. Eckerd's performance, is belied by the fact that the School District by contract expressly permits teachers to express their views in response to evaluations and criticisms. As plaintiff properly argues, in the context of the applicable bargaining agreement, it is absurd to conclude that teachers are permitted to express their agreement with adverse evaluations but not to communicate their disagreement, on the grounds that the latter is disruptive of supervisory discipline. Indeed, it can persuasively be contended that the failure to permit expressions of employee disagreement with supervisory conclusions is more disruptive of working relationships, because discontent and disrespect may be fomented when employees are powerless to object to what they may conclude are unfounded and erroneous supervisory criticisms. Although a teacher's expressions of disagreement with his superiors may be subjected to reasonable time, place and manner restraints in order to prevent the disruption of day-to-day academic activities, no evidence of such disruption has been presented. The worse that can be said of Mr. Eckerd's written and spoken opinion is that Mr. Knowles and the School Board

did not agree with them and did not like to have their policies and practices criticized. This reaction by the recipients of Mr. Eckerd's comments is insufficient to warrant limitation of the plaintiff's First Amendment rights under the circumstances of this case. As the Court said in *Puentes v. Board of Education*, 24 N.Y.2d 996, 250 N.E.2d 232, 233 (1969):

> There is no suggestion in the record that petitioner's indiscretions led to any deleterious effects within the school system, and it is unlikely that they should have. Indiscreet bombast in an argumentative letter, to the limited extent present here, is insufficient to sanction disciplinary action. Otherwise, those who criticize in an area where criticism is permissible would either be discouraged from exercising their right or would be required to do so in such innocuous terms as would make the criticism seem ineffective or obsequious.

In summary, the Court concludes that Mr. Eckerd's speech and expression was a substantial or motivating element in the Board's decision to terminate him, within the meaning of *Mt. Healthy*. His interest in expressing his opinions and disagreements with the administration in the manner in which he chose to do so outweighs any demonstrable interest of the school district in maintaining discipline and orderly delivery of services, and his speech was therefore within the protection of the First Amendment.

## IV. *LIABILITY UNDER MT. HEALTHY*

▪ The plaintiff having made a prima facie showing that he is entitled to relief on the grounds of a constitutional violation, the burden then shifted to the defendants under *Mt. Healthy* to demonstrate by a preponderance of the evidence that Mr. Eckerd would nonetheless have been terminated if the Board had not considered his protected speech. The Court concludes that the defendants have not met this burden. Although deciding the *Mt. Healthy* question in teacher discharge cases ordinarily involves a prediction that is difficult at best,

---

**40.** See part IV, *infra*.

in the present case, the Court is not forced to rest its holding on an educated guess about how the Board would have ruled, because the termination of plaintiff for willful and persistent insubordination would have violated State law.

The meaning of "willful and persistent insubordination" under the Delaware teacher termination statute is principally interpreted by the case of *Shockley v. Board of Education,* 149 A.2d 331 (Del.Super.), *rev'd on other grounds,* 155 A.2d 323 (Del.1959). After noting that the Delaware statute does not define the words "willful and persistent insubordination," the *Shockley* court, relying upon a variety of case, commentary and dictionary definitions, concluded that willful and persistent insubordination may be defined as: "[a] constant or continuing intentional refusal to obey a direct or implied order, reasonable in nature, and given by and with proper authority." [41] Had the evidence of Mr. Eckerd's disagreements with the Administration's critiques · and evaluations, as embodied in his written responses thereto, been dropped from the Board's consideration, there would have remained the allegation that Mr. Eckerd violated seven specific school district policies or directives.[42] After examining these allegations individually and after considering their cumulative effect, the Court cannot conclude that they demonstrate the plaintiff's willful and persistent insubordination. It may be assumed that the Board, acting reasonably and without bias toward the plaintiff, would have evaluated the Administration's recommendation to discharge him in light of this court-approved standard, and would have voted against his termination. Had they done otherwise, the decision would not have withstood judicial review.

In his testimony at trial, Mr. Lee, after noting that plaintiff's attitude was the central reason for his termination, stated that:

The real problem that the board debated on insubordination was whether or not any of these incidents involved situations where he had been specifically told that what he had done was wrong and had done the same act again. I can't remember whether there was anything that came close to that. I don't remember the specific incidents. But if there was, there was only one or two. Most of these involved rule violations that once he was reprimanded for that specific incident did not occur.[43]

The Court agrees that the evidence presented by the administration did not warrant the conclusion that Mr. Eckerd had repeatedly violated the same known rule, and there is therefore no basis for finding that the alleged rule violations, individually, constitute "a constant or continuing intentional refusal to obey a direct or implied order." The defendants, however, argue that, taken as a whole, plaintiff's pattern of rule violations demonstrates that he selectively chose a variety of different rules to violate as a means of expressing his disregard for his employers authority. To the extent the school board was convinced by this argument, it of necessity relied upon the written evidence of Mr. Eckerd's critical attitude toward some of Mr. Knowles' reprimands to infer that the alleged rule violations were intentional and that they established a pattern of constant, continuing disregard of directives. Discounting these written expressions, which have been found to be protected under the First Amendment, the evidence of rule violations standing alone is grossly insufficient to permit the inference of an intentional pattern.

Findings of Fact numbers 1 and 7 [44] —which are inexplicably redundant—hold that plaintiff violated a known policy requiring faculty members to attend pre-announced faculty meetings. The evidence shows that the plaintiff missed two such

---

**41.** 149 A.2d at 334.

**42.** PX 11, findings 1–8 (numbers 1 and 7 are duplicative and therefore only seven violations are involved).

**43.** C–20.

**44.** PX 11, findings 1 and 7.

meetings in eight years.[45] In 1974, Mr. Eckerd missed the first faculty meeting of the year, because he was preparing his students for the first football game of the season. Absence at this first meeting was a matter of routine for the plaintiff,[46] and when informed in October, 1974[47] that this practice was to be eliminated, Mr. Eckerd thereafter attended the first faculty meeting of every school year prior to his discharge. His absence at a February meeting in 1976 is conceded by both sides to have resulted from an inadvertent failure to check the bulletin board before scheduling community-wide majorette tryouts.[48] When, prior to the faculty meeting, Mr. Eckerd was verbally reprimanded for this oversight, he apologized and offered to cancel the tryouts. Mr. Knowles testified in the Board hearing that he did not require Mr. Eckerd to do so,[49] although his letter of reprimand to the plaintiff[50] states that Mr. Eckerd had been instructed to attend the meeting. Although this letter stated that plaintiff's absence was "an act of willful insubordination," Mr. Knowles' admission on the witness stand demonstrates that it cannot be so characterized. Neither of the two absences upon which the district relies can be viewed as an intentional violation of a known directive or rule, and cannot, *a fortiori*, be used to support the inference of an intentional pattern of such violations.

The Board's second Finding of Fact[51] stated that the plaintiff knew or should have known of the district policy requiring the band to play at all football games (scheduled or rescheduled) but that nevertheless the plaintiff on at least one occasion failed to have the band appear at a rescheduled football game. Although Mr. Eckerd knew of the general policy requiring the band's presence at football games, it was his uncontradicted testimony that he had never received specific instructions about rescheduled games, and that the band had previously failed to play one rescheduled game about which he had received no criticism or reprimand.[52] When informed that the Indian River School Board wished the band to be present even at rescheduled football games, Mr. Eckerd thereafter arranged for such attendance.[53] It is concluded that Mr. Eckerd's decision not to require the band to perform at the game in question was made with a proper regard for maintaining a high quality in the band's performances—a goal that might have been threatened had the performance elicited a poor turnout of students.[54] There is no evidence to suggest that Mr. Eckerd made this decision in the face of a policy to the contrary which he knew or should have known, and indeed the question was of sufficient uncertainty to require presentation to the full Board of Education, following the incident relied upon by the Administration.[55] One of the members of the Board who testified remembered no prior policy on the subject.[56] No insubordination within the *Shockley* formulation can be inferred from this incident.

The third Finding of Fact[57] held that Mr. Eckerd had knowingly violated the district's grading policy by giving grades lower than the policy permitted, by failing to send home failure notices before failing a student, and by failing to give each student one grade per week per marking period. Without engaging in an elaborate explanation of the complex details of the district's grading system, it is concluded that Mr.

---

45. PX 1, at 116–17.

46. *Id.;* at 129–30.

47. PX 2 (A2).

48. PX 1, at 81–83.

49. *Id.,* at 82.

50. PX 2 (A–10).

51. PX 11, finding 2.

52. A–67, 155–56.

53. A–56.

54. PX 2 (A–7, attached letter).

55. A–87–88; PX 2 (A–9).

56. B–147–8.

57. PX 11, finding 3.

Eckerd's conduct with respect to the incident in question did not constitute an intentional violation of a rule he knew or should have known. Mr. Eckerd and two teachers who testified on his behalf at the hearing (one of whom has been involved in drafting the Board's grading policy) concluded that Mr. Eckerd's method of assigning grades had been both proper and consistent with that used by all other teachers in the school.[58] Mr. Knowles and administrative assistant Dill both agreed with the teacher's interpretation of the policy, but Mr. Dill acknowledged that there had been some confusion surrounding its implementation.[59] The Court has examined the mandate of the grading policy introduced at the Board hearing[60] and finds that there is some uncertainty as to whether this was the policy in effect when the grading incident occurred, and that the language employed therein was sufficiently ambiguous to preclude a finding that Mr. Eckerd's violation of the policy, if any, could be deemed willful. Although the defendants failed to prove an intentional violation of a known grading policy, what was clear from the testimony before the Board and at trial was that the plaintiff's contractually protected[61] refusal to change several failing grades required the Board to exercise its contractual right to order the grades changed. Mr. Eckerd, of course, could not be disciplined for exercising this right, nor could his adherence to a contractual right be viewed as evidence of insubordination.

The next two Findings of Fact, numbers 4 and 5,[62] concern the plaintiff's failure to deposit $50 he received for the school (and the subsequent loss of that money) and his failure to have a storage area locked at one point when Mr. Knowles noticed it. Mr. Eckerd's offer to reimburse the District for the lost cash was declined,[63] and there was no evidence that any loss resulted from the plaintiff's failure to lock the storage area. Although both of these incidents involve some negligence on Mr. Eckerd's part, the evidence surrounding each event offers no indication that Mr. Eckerd was intentionally violating a known rule. Neither incident can be viewed as an intentional flouting or disregard of school policy or supervisory directives, and there is no evidence that plaintiff's negligence in these regards was ever repeated.

Finding of Fact number 6[64] recites that Mr. Eckerd failed to comply with three separate requests to provide the supervisory staff with a list of students qualified to participate in the County Chorus. The Finding is consistent with a letter of reprimand sent from Mr. Knowles to the plaintiff,[65] but the Administration offered no evidence as to when the requests took place or who made them. Mr. Eckerd, on the other hand, testified that he had initially forgotten to supply the list, but when Mr. Knowles asked him in person a second time, the list was immediately supplied. The letter of reprimand was apparently written after plaintiff's submission of the required list.[66] Mr. Eckerd acknowledged his negligence in forgetting to provide the list, and although it is clear that the plaintiff felt overworked and pressured at the time of this incident,[67] his conduct cannot be construed as an intentional refusal to comply with a directive, particularly in view of the fact that he complied promptly when reminded.

58. PX 1, at 150–53, 233–36, 252–53.

59. B–89–94.

60. PX 2 (A–18).

61. Article IV F.

62. PX 11, findings 4 and 5.

63. PX 1, at 114. Mr. Knowles acknowledged that this loss was accidental and that other teachers had lost school funds and were not terminated.

64. PX 11, finding 6.

65. PX 2(A–6).

66. PX 1, at 131–32; B–176–77.

67. PX 2 (A–6, teacher's comments).

Finding of Fact number 8 [68] states that Mr. Eckerd failed to adhere to specific directives that he involve "all students enrolled in band in band programs and rehearsals, and a specific directive that all students who enrolled in band should be scheduled for lessons." Mr. Eckerd explained the allegations leading to this finding by stating that those students without minimal proficiency in playing an instrument were not involved in regular band activities, but rather their instruction was confined to individual lessons.[69] Mr. Knowles acknowledged that this was indeed a necessary arrangement, but further contended that some students were not regularly attending their scheduled lessons.[70] Mr. Knowles did not produce the records upon which he claimed to rely in advancing this latter charge,[71] and Mr. Eckerd testified that to the best of his knowledge students who missed lessons without justification were reported to the office.[72] Mr. Knowles acknowledged [73] that the result of plaintiff's instructional methods was satisfactory: the band improved, and by Christmas all but five students were able to participate in band performances.[74] Although Mr. Knowles seemed dissatisfied at finding band students who did not participate in rehearsals, were without uniforms, or did not march with the band,[75] he was unable to demonstrate that the lack of participation he observed at any given time was due to any failure on Mr. Eckerd's part to provide an adequate program of music instruction. Mr. Eckerd's explanation of the situation is reasonable and credible, and it appears likely that while Mr. Knowles objected to student inactivity, he never stopped to consider their level of capability.

As should be apparent from the foregoing analysis of the evidence supporting the Board's findings 1–8, the Court does not conclude that there was substantial evidence in the record before the Indian River School Board to support a finding that Mr. Eckerd was willfully and persistently insubordinate. There was no evidence of repeated violations of the same rule, and because Mr. Eckerd's limited culpability seems to be for negligence, it cannot be inferred that the plaintiff was demonstrating a continuing and intentional refusal to obey district rules and directives. Although Mr. Eckerd frequently expressed his disagreement with some of these policies, he never threatened to disobey them. The violations proved do not in concert suggest a purposeful flouting of authority.

I am satisfied that absent consideration of plaintiff's protected expressions of opinion disagreement, the Indian River School Board would not have confirmed the Administration's recommendation to terminate Richard Eckerd because to do so would have been a clear violation of State law. The plaintiff is therefore entitled to prevail on his claim that he was unjustly terminated in violation of his constitutional rights.

## V. DAMAGES

The Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658, 690 and n.55, 78 S.Ct. 2018, 2036, and n.55, 56 L.Ed.2d 611 (1978), makes it clear that the Indian River Board of Education and the Indian River School District "can be sued directly under § 1983 for monetary, declaratory or injunctive relief," and that "local government officials [here, school board members] sued in their officials capacities are 'persons' under § 1983 in those cases in which, as here, a local government would be suable in its own name." Neither does the Eleventh Amendment protect the present defendants from liability, because the school board and its officers cannot be viewed as an arm of the State for

---

68. PX 11, finding 8. As previously noted, finding 7 repeats the substance embodied in finding 1. See text accompanying notes 44–50, *supra.*

69. PX 1, at 166.

70. *Id.,* at 91–93.

71. *Id.,* at 93.

72. *Id.,* at 167, 218–19.

73. PX 1, at 101; PX 2 (T–8).

74. PX 1, at 101–02, 216.

75. PX 1, at 64, 94; PX 2 (A–12).

the purposes of this case and may not invoke the protections of sovereign immunity. *See Hawkins v. Board of Public Education in Wilmington*, 468 F.Supp. 201, at 214 (D.Del.1979); *Morris v. Board of Education of Laurel School District*, 401 F.Supp. 188, 203–05 (D.Del.1975). *See also Monell, supra*, 436 U.S. at 690 n.54, 98 S.Ct. 2018; *Edelman v. Jordan*, 415 U.S. 651, 667 n.12, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Mahone v. Waddle*, 564 F.2d 1018, 1031 n.27 (3d Cir. 1977).[76]

Turning to the elements of the damages to which plaintiff is entitled, there is ample authority to support the proposition that a plaintiff discharged in violation of his First Amendment or other constitutional rights is entitled to reinstatement and back pay to compensate him for the salary lost due to his improper discharge. *Aumiller v. University of Delaware*, 434 F.Supp. 1273 at 1307–08 (D.Del.1977) (and cases cited therein). Defendants do not contest this general rule, but rather argue that plaintiff's right to monetary relief is vitiated by his failure to prove that he was unable to find alternative employment in mitigation of his damages. Defendants, however, have introduced absolutely no evidence that there were jobs available which plaintiff could have discovered and for which he was qualified, although it was clearly their burden to prove failure to mitigate damages. *Hegler v. Board of Education of Bearden School District*, 447 F.2d 1078 (8th Cir. 1971); *Rolfe v. County Board of Education of Lincoln County*, 391 F.2d 77 (6th Cir. 1968). Plaintiff, on the other hand, testified that he had unsuccessfully sought employment in three other school districts, and he offered the largely unrebutted testimony of a proprietor of a national educational placement service to establish that the employment opportunities for any high school music teacher were, and are, so limited that one previously discharged for insubordination would have virtually no chance of finding reemployment.

The Court concludes that plaintiff is entitled to be reinstated in his employment with the Indian River School District,[77] to receive seniority and experience credit for the two academic years since his discharge, to have all record of the discharge removed from his personnel file, and to recover his lost salary. Based on the testimony of the district's administrative assistant, Mr. Dill (which is qualified in the margin),[78] and assuming that Mr. Eckerd would have directed the maximum number of choral concerts for which he could receive payment, plaintiff's lost salary and benefits total $29,502. This sum, however, must be reduced by an amount equal to the salary and benefits earned by Mr. Eckerd during his assistantship at the University of West Virginia, where he has recently been pursuing his doctorate in music. The plaintiff testified that he was paid $2,550 per academic year in salary, and that the University's payment of his tuition and fees

---

**76.** No sovereign immunity or Eleventh Amendment defense was urged in this case.

**77.** Plaintiff testified to a desire to return to his former employment, and the district has introduced no evidence other than that discounted in part IV, *supra*, that as a tenured teacher his contract would not have been renewed for the school years following his discharge.

**78.** Calculations of lost salary and benefits (See Mr. Dill's testimony, B–28–29):

1977–78

| | |
|---|---|
| State salary | $11,621 |
| Local supplement | 2,070 |
| Band director's extra duty pay | 300 |
| Choral director's extra duty pay (assumes maximum number of concerts directed) | $   150 |
| TOTAL 77–78 | $14,141 |

1978–79

| | |
|---|---|
| State salary | $12,591 |
| Local supplement | 2,070 |
| Band director's extra duty pay | 400 |
| Choral director's extra pay (assumes maximum number of concerts directed) | 180 |
| Optional cash or health care payment | 120 |
| TOTAL 78–79 | $15,361 |
| TOTAL 1977–79 | $29,502 |

was worth $750 per semester.[79] Assuming that two academic years and four semesters have elapsed since Mr. Eckerd began his doctoral study in October, 1977,[80] his back pay award must be reduced by $8,100 to total $21,402.

The plaintiff also claims that he is entitled to receive damages to compensate him for his lost income as a result of a diminished opportunity to give private piano lessons and to play private commercial music engagements. Mr. Eckerd testified that as a result of his discharge, he was forced to rent his mortgaged house in order to meet the mortgage payments, and to move his family into his mother's home in Morgantown, West Virginia.[81] Plaintiff found that possibilities of earning extra money by teaching and playing commercial music engagements was substantially greater in Delaware than West Virginia. He testified that this was true because the southern Delaware resort area offered a good market for commercial musicians, while Morgantown, West Virginia, did not.[82] He also found that what private piano lessons were given in the Morgantown area were given at the University of West Virginia Conservatory.[83] Plaintiff also noted that the size of his mother's home in Morgantown and the cost of shipment precluded his bringing his piano to West Virginia, and that he therefore had no instrument on which to teach private lessons.[84]

The Court is convinced that Mr. Eckerd's claim for lost piano lesson income may be viewed as proved to a reasonable certainty, but that the same may not be said of his claim for lost revenues from commercial music engagements. Plaintiff's tax return for his last full year spent in Delaware, 1976, shows a net income of $3,028.35 from piano lessons,[85] and there is no evidence or basis for inferring that his ability to deliver such services would have been curtailed

over the next three years. In his position with the high school, Mr. Eckerd had ample opportunity to contact potential pupils and he had a work schedule that assured him a regular allotment of free time in which to teach. Plaintiff's explanation for his inability to give lessons in West Virginia is reasonable and persuasive, and he will therefore be entitled to recover a sum to compensate him for this lost opportunity to earn extra income. Using the 1976 income as a basis for calculation, and finding that Mr. Eckerd has been unable to give lessons for two years, he is entitled to recover $6,056.70.

■ Although plaintiff's net income from commercial music in the years 1976, 1977, and 1978 is likewise proven with specificity through his wife's largely unchallenged testimony from the couple's federal income tax returns,[86] the amount of financial damage he suffered is too speculative to permit an award. Although the Eckerds spent a substantial portion of 1977 in West Virginia, Mr. Eckerd's net commercial music income dropped only $212 that year (from $2,462 in 1976 to $2,240 in 1977). This net 1978 commercial music income was reduced to $1,424, but the real causes of this reduction cannot be verified. Absent proof of bookings that would have been available to the Eckerds in Delaware or of a longer history of regular income from commercial music, damages cannot be awarded for this loss.

■ Finally, plaintiff claims damages for the emotional distress, embarrassment and humiliation he has suffered as a result of his discharge and for the ensuing dislocation of his life and that of his family. Mr. Eckerd and his wife testified that he had difficulty sleeping for six to eight months following his termination, and that he required the care of a physician, medicine and

---

79. A–126.

80. A–121.

81. A–51–52.

82. A–148.

83. A–52–53.

84. A–57, 160–61.

85. B–3.

86. B–3–7.

a special die to treat his exacerbated symptoms of a preexisting allergic condition.[87] Mrs. Eckerd's records showed that this medical treatment produced an expense of $448.34.[88] In addition, the Eckerds were forced to send their children to Florida while Mr. Eckerd and his wife sought employment and supplemental income.[89] In order to meet mortgage payments, Mr. Eckerd decided to rent his mortgaged house and was required to move his family in with his mother in West Virginia.[90] He also sold his motorcycle to help cover daily living expenses,[91] and at last was forced to apply for food stamps.[92] Mrs. Eckerd testified that her husband was emotionally wrenched by these events, became less patient and tolerant with his children, and became depressed, withdrawn, and jittery.[93]

The court is satisfied that this testimony is sufficient to permit the award of compensatory damages for Mr. Eckerd's emotional distress. Relying upon a substantial line of federal court cases, this Court concluded in *Aumiller v. University of Delaware, supra,* 434 F.Supp. at 1310, that

> in order to recover damages for emotional distress, embarrassment and humiliation, it is only necessary for plaintiff to show: (1) that plaintiff in fact suffered emotional distress, embarrassment and/or humiliation; and (2) that defendant's actions proximately caused plaintiff's injury.

Defendants raise no serious contention that plaintiff's emotional trauma was not proximately caused by his termination. The Court is also persuaded by the sincerity and credibility of the plaintiff and his wife that his suffering in fact occurred. The turmoil claimed by Mr. Eckerd is only that which a reasonable man might experience under the circumstances, and is similar to that which the Court made the basis for a damage

award in *Aumiller, supra.* It is concluded that Mr. Eckerd is entitled to recover $5,000 in damages for his emotional distress and humiliation.

## VI. IMMUNITIES

Defendants contend that the members of the Board of Education, sued in their individual capacities, should be relieved of any personal liability for the money damages awarded Mr. Eckerd under the immunity formulation contained in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The defendants also argue that a form of official immunity comparable to that articulated in *Wood v. Strickland* should also apply to shield the School District, the School Board and the members of the Board in their representative capacities from liability for a damage award.

### A. Liability of School Board Members in Their Individual Capacities

Addressing first the question of the personal liability of the School Board members who have been sued in their individual capacities,[94] the Court concludes that the requirements of *Wood v. Strickland* have not been met and that each of these defendants is jointly and severally liable for the damages to which Mr. Eckerd is entitled. In the context of a school discipline case, the *Wood* Court recognized that a common law immunity applies to section 1983 actions to protect public officials:

> [A] school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a

---

**87.**  A–57–58, 203.

**88.**  B–7.

**89.**  A–205.

**90.**  A–51–52.

**91.**  A–57.

**92.**  A–207.

**93.**  A–203–04.

**94.**  These are members Short, Mitchell, Tribbitt, Townsend, and Collins—each of whom voted to terminate the plaintiff.

deprivation of constitutional rights or other injury to the student.[95]

This formulation has also been found applicable to determining the immunity of school board members in teacher discharge cases. See Skehan v. Board of Trustees, 538 F.2d 53, 59–62 (3d Cir. 1976) (en banc); Morris v. Board of Education, 401 F.Supp. 188, 216 (D.Del.1975).

> The Third Circuit has held that
>
> the burden is on the defendant official claiming official immunity to come forward and to convince the trier of fact by a preponderance of the evidence that, under the standards of Wood v. Strickland, official immunity should attach.

Skehan, supra, 538 F.2d at 62. See also Forsyth v. Kleindienst, 447 F.Supp. 192, 202 (E.D.Pa.1978); Eubanks v. Clarke, 434 F.Supp. 1022, 1033–34 (E.D.Pa.1977); Aumiller, supra, 434 F.Supp. at 1307; Mack v. Johnson, 430 F.Supp. 1139, 1147 (E.D.Pa. 1977). In the present case, the record concerning the defendants' subjective and objective good faith is so sparse[96] that the mere application of the burden of proof rule (where neither side has presented evidence) could settle the question in plaintiff's favor as to several of the defendants, but some discussion of what evidence exists is warranted.[97]

Turning first to the second prong of the Wood v. Strickland standard, which requires defendants to adduce evidence that they acted in good faith and without malice or intent to deprive the plaintiff of his constitutional rights, the defendants introduce testimony of only four individual defendant Board members.[98] Messrs. Short, Mitchell and Tribbitt all testified that they had no bias toward the plaintiff, were influenced by no external factors to vote in favor of his termination, and harbored no conceptions of the propriety of the discharge prior to hearing the testimony adduced at his termination hearing.[99] Mr. Townsend's deposition contains no such assertion of impartiality, and defendant Collins offered no testimony to the Court on this or any other issue. To rebut the testimony of defendant Mitchell that he had no prior bias against Mr. Eckerd, plaintiff introduced evidence through Mr. Mitchell that he had once found occasion to have the plaintiff reprimanded for his dress at a public concert. Moreover, the testimony showed that Mr. Mitchell believed Mr. Eckerd to have acted inappropriately in expressing his disagreement with the Board member's views to him by writing directly instead of "going through channels."[100] Although this testimony sheds little evidentiary light on the question of the defendants' subjective good faith, the Court concludes that it has no basis for finding Messrs. Townsend and Collins immune from liability to the plaintiff. Messrs. Short, Mitchell and Tribbitt, however, have offered enough evidence of their good faith to

---

**95.** 420 U.S. at 322, 95 S.Ct. at 1001.

**96.** Although defendants' immunity claims were raised in their answer, they received little if any attention during trial, post-trial briefing, and the better part of oral argument. When defense counsel asserted at the end of his argument that his clients did not intend to waive the immunity defenses (even though they were never urged in the briefs), the defense was permitted to address the issue and the matter became the subject of supplemental briefing.

**97.** In Mack v. Johnson, supra, the Court considered a case presented for decision by written submissions, in which "the defendants . . never submitted any evidence to support an allegation that they acted with the subjective good faith belief that what they were doing was proper." 430 F.Supp. at 1147. Following Smith v. Wendell, 390 F.Supp. 260, 263 (E.D. Pa.1975), the court considered that it could not

make a finding that the officials involved were immune from personal liability. In Mack, however, the court went on to offer an alternative ground for rejecting the immunity defense, by noting that by an objective measure the defendants should have known that their conduct was improper because two recent cases had resolved the substantive questions in favor of plaintiff.

**98.** Board members Short, Mitchell and Tribbitt testified at trial, and the deposition of the Board's president, Chester V. Townsend, was admitted as DX 2.

**99.** This testimony appears at B–104–05 (Short); B–111, 134 (Mitchell); and B–145 (Tribbitt).

**100.** B–126–31.

require countering evidence by the plaintiff, who did nothing to refute the assertions of Messrs. Short and Tribbitt and whose evidence concerning Mr. Mitchell's possible bias the Court deems insufficient to cast persuasive doubts on his impartiality as a decision-maker.

The testimonial evidence concerning the first prong of the *Wood v. Strickland* test is, if possible, even more sparse. No immunity can operate to protect school board members who "knew or reasonably should have known" that their action would violate a teacher's constitutional rights. At no time, however, did any Board member testify that the Board engaged in any discussion about the constitutionality of considering and relying upon Mr. Eckerd's written and spoken expressions of his opinions. No Board member volunteered or was asked whether First Amendment considerations entered into his deliberative process or whether he even remembered the presence of a First Amendment argument in Mr. Eckerd's case and the existence of legal precedent bearing upon it. Nevertheless, it was settled law at the time of the Board's decision to terminate Mr. Eckerd that *Pickering, supra*, required a balancing of a school district's interest in internal discipline against the teacher's interest in freedom of speech. Although the termination occurred prior to the Supreme Court's decision in *Givhan, supra*, the Third Circuit's opinion in *Roseman v. Indiana University of Pennsylvania*, 520 F.2d 1364 (3d Cir. 1975), had applied such a balancing test in its consideration of communication made in a private context and involving issues of a less than general public interest. The defendants' failure to introduce any evidence that these settled precepts were applied or considered—particularly when the matter had been brought to the Board's attention in plaintiff's post-hearing brief [101]—must defeat the individual members' claims of immunity. The Court's opinion in *Wood v. Strickland* makes it clear that "a school

board member, who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students," cannot be protected by official immunity if he acts without knowing and considering basic constitutional rights. The Supreme Court concluded that

> [s]uch a standard imposes neither an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system.[102]

If the members of the Board who voted to terminate Mr. Eckerd are to be saved from personal liability to Richard Eckerd, it must be on the basis of one small piece of testimony. Mr. Lee, who was employed by the Board to advise them "on legal matters," was asked if he remembered specific questions placed to him by members of the Board during their deliberations. He replied:

> I can only recall one question. I was asked whether I thought if, whether he was fired, it would stand up in Federal Court. And I avoided a direct answer to that question. I finally said that that would depend upon a lot of factors that I could not and would not assume responsibility for, and I didn't think it should be a major consideration in their deliberations.[103]

The Court is not convinced that the question to which Mr. Lee referred was intended to import an inquiry into whether any of Mr. Eckerd's constitutional rights, specifically his First Amendment rights, would be violated by a discharge. Mr. Lee also testified that he was hired to advise the School Board president on legal objections and motions raised during the hearing,[104] and that the prime reason for his presence at the executive session was "to attempt to grant

---

**101.** PX 9.

**102.** 420 U.S. at 322, 95 S.Ct. at 1001.

**103.** C–9.

**104.** C–6.

procedural due process." [105]  Mr. Lee further testified as follows:

Q. Did the board members ask you for any legal advice about whether their actions might violate Mr. Eckerd's constitutional rights?

A. I don't recall anything coming up in that context. [106]

\* \* \* \* \* \*

Q. All right. Let me ask you if anyone asked whether a termination because of Mr. Eckerd's exercise of his rights of free speech would violate his constitutional rights.

A. That was never discussed, to the best of my knowledge.

Q. There was no request for legal advice with regard to the fact that Mr. Eckerd had made comments in written communications?

A. To the best of my knowledge. To the best of my recollection, there was no such inquiry. [107]

Furthermore, even if the question addressed to Mr. Lee can be viewed as importing the Board's request that their counsel give them his opinion about the constitutionality of their actions, the response received is not the sort of reasoned advice of counsel upon which a Board member should be entitled to rely. It is true, that the Court in *Wood v. Strickland* expressed some concern about Board members' being held personally liable to plaintiffs after relying on a lawyer's advice, [108] but the objective prong of the *Wood v. Strickland* standard ought not be interpreted to permit individuals to avoid the responsibilities of public office by the simple act of consulting a lawyer. Although a school board member may not be charged with knowing the interplay of complex legal principles and with awareness of subtle changes in case law, a member seeking to establish his official immunity should be required to show at least that he had some reasonable basis for trusting his attorney's

advice. In the present case, Mr. Lee's response, by his own testimony, was at best tentative and uncertain, and he gave the Board members no firm advice or reasons for his conclusions. The Court does not believe, therefore, that the defendants have demonstrated that they had a reasonable basis for relying on Mr. Lee's advice and, more significantly, that they viewed him as having offered any advice concerning the First Amendment upon which they could and did rely.

By contrast, in those cases in which reliance on the advice of counsel has formed the basis for a grant of official immunity, evidence was presented that the officials involved understood the basis for their attorney's advice and the general reliability of the authority on which his conclusions were based. In *Hutchison v. Lake Oswego School District*, 519 F.2d 961 (9th Cir. 1975), the defendant school board members sought a ruling from the State Director of Legal and Executive Services on the question whether pregnancy could permissibly be excluded from sick leave coverage. In *Handverger v. Harvill*, 479 F.2d 513 (9th Cir.), *cert. denied*, 414 U.S. 1072, 94 S.Ct. 586, 38 L.Ed.2d 478 (1973), the defendant university president consulted with his attorney and a variety of other advisors at a series of meetings at which the legality of thwarting a student demonstration was discussed. There was evidence that the State Attorney General was also consulted, and that various specific legal techniques and considerations were evaluated.

The individual defendants in the present case have made no comparable showing that their "duty to know" was fulfilled by a reasonable reliance on the advice of counsel, although their testimony at trial and in deposition provided them ample opportunity to submit such evidence. Under the circumstances, the Court cannot conclude that they have carried their burden of proving

105. C–16.

106. *Id.*

107. C–17.

108. See 420 U.S. at 329 n.2 (Powell, J., dissenting).

that an immunity should attach to protect them from personal liability to the plaintiff.

### B. Liability of the Defendants in Their Official Capacities

The plaintiff has withdrawn his claims for personal liability against those members of the Board who voted to reinstate him [109] or who did not vote,[110] and seeks only relief against them in their official capacities.[111] These members, however, along with those the Court has previously found to be personally liable to Mr. Eckerd, assert that after *Monell* they, as well as the bodies politic [112] which they form, are entitled to claim a qualified immunity from damage liability in their official capacities under a doctrine like that announced in *Wood v. Strickland.* This claim is based upon the following language in *Monell v. New York City Department of Social Services, supra* :

> Since the question whether local government bodies should be afforded some form of official immunity was not presented as a question to be decided on this petition and was not briefed by the parties or addressed by the courts below, we express no views on the scope of any municipal immunity beyond holding that municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 be "drained of meaning," *Scheuer v. Rhodes,* 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). *Cf. Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 397–98, 91 S.Ct. 1999, 29 L.Ed.2d 319 (1971).[113]

In all but one of the post-*Monell* cases that have considered the municipal immunity question, it has been held that an immunity comparable to the one developed in *Wood* is applicable to protect governmental

entities and their representatives sued in an official capacity. *Bertot v. School District No. 1,* —— F.2d —— (10th Cir. 1978); *Ohland v. City of Montpelier,* 467 F.Supp. 324 (D.C.Vt.1979). *See also Leite v. City of Providence,* 463 F.Supp. 585 (D.C.R.I.1978). The *Ohland* court recognized that "[i]t is necessary for courts to look beyond the state of knowledge and responsibilities of the named individual defendants and to construct a good faith standard for the [governmental body] as an entity . . ," [114] but yet assumed the propriety of such a defense. On the other hand, *Shuman v. City of Philadelphia,* 470 F.Supp. 449 (E.D. Pa.1979) found that the qualified immunity was unavailable where a constitutional deprivation results from an official departmental policy, rather than from an ad hoc decision.

I am not persuaded that the weight of the case law should—or ultimately will—formulate any good faith immunity defense available to governmental entities and their officers acting in a representative capacity. The strongest policy rationale underlying the *Wood v. Strickland* holding—that of encouraging public officers to serve and act conscientiously without unreasonable fear of damage awards that could drain their limited personal funds—is far less compelling when the fiscal resources involved are those of a municipality or school board. Furthermore, the Supreme Court's finding that Congress's enactment of Section 1983 intended the retention of common-law immunities,[115] suggests that no qualified immunity should be available to political entities. No such defense was known at common law: the only immunity of governments was absolute under the notion of sovereign immunity, and as such, is precluded by *Monell.*[116]

---

**109.** Members Bailey, Lambden and Lewis.

**110.** Members Monroe and Murray.

**111.** A–31–32.

**112.** The Indian River School District and the Indian River Board of Education.

**113.** 436 U.S. at 701, 98 S.Ct. at 2041.

**114.** At 347.

**115.** See *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

**116.** 436 U.S. at 701, 98 S.Ct. 2018. See generally, E. Schnapper, "Civil Rights Litigation after *Monell*," 79 Col.L.Rev. 213, 240–53 (1979).

In the present case, however, even assuming arguendo the availability of a good faith immunity defense, it could succeed in protecting neither the School Board, the School District, nor the Board members sued representatively. When, as here, a political entity has deprived a plaintiff of his constitutional rights and when over half of its voting members have been found to have acted with disregard of what constitutional rights they may be infringing, the entity cannot be viewed as having acted in good faith so as to be immune from liability, and the responsibility for any damages that flow therefrom must be shared equally by each member of that body in his or her official capacity. A governmental body can act at all only through the actions of its individual members, and each member must be equally charged with the responsibility for the body's failure to act in good faith or with an awareness of constitutional rights. Such responsibility cannot be avoided by individuals merely by registering a dissenting vote or even by absenting one's self from a proceeding.

The Court therefore finds that damages awardable to Mr. Eckerd may properly be assessed against the Indian River School District, the Board of Education, and the individual defendants acting in their official capacities. Defendants Short, Mitchell, Tribbitt, Townsend and Collins will also be held personally liable for these damages.

## VII. CONCLUSION

Judgment in this case will be entered in favor of the plaintiff Richard E. Eckerd, because the Court has found that consideration of activities protected by the First Amendment played a substantial or motivating role in the defendants' decision to terminate plaintiff's employment. The Court also concludes that a decision to terminate Mr. Eckerd without reference to these protected activities would not have been made by the Board, and in any event would have been violative of the Delaware teacher termination statute. Mr. Eckerd is entitled to be reinstated to his position with the Indian River School District, with full seniority and experience credit, to have his record expunged and to receive $21,402 in back pay, representing his lost salary offset by his interim earnings from the University of West Virginia. He is also entitled to receive $6,056.70 to compensate for his lost opportunity to teach private piano lessons and $5,000 in damages for emotional distress and humiliation. The Indian River School District, the Indian River Board of Education, the Board members in their official capacities and members Short, Mitchell, Tribbitt, Townsend and Collins in their individual capacities will be held jointly and severally liable to Mr. Eckerd for these damages.