Israel **ALICEA ROSADO**, Plaintiff, Appellee,

v.

Ramon **GARCIA SANTIAGO** et al., Defendants, Appellants.

No. 76–1429.

United States Court of Appeals, First Circuit.

Heard Feb. 16, 1977.

Decided Sept. 13, 1977.

Ronaldo Rodriguez Ossorio, Asst. Sol. Gen., with whom Roberto Armstrong, Jr., Acting Sol. Gen., San Juan, P. R., was on brief, for defendants, appellants.

Harvey B. Nachman, Santurce, P. R., with whom Law Offices of Harvey B. Nachman, Santurce, P. R., was on brief, for plaintiff, appellee.

Before VAN OOSTERHOUT,* INGRA-HAM,** and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Plaintiff-appellee Alicea Rosado has been employed by the Commonwealth of Puerto Rico for nearly twenty years. From 1965 to 1975 he was District Director of the Barranquitas Office of the Department of Social Services and was classified as a Social Worker V. The Commonwealth began participating in the federal food stamp program in 1974 and Barranquitas was selected as one of the first distribution sites. Administrative difficulties beset the program from the outset and in May 1975 Alicea was summoned by his regional supervisor, Mr. Jesus Jiminez, to explain the situation. At Jiminez' request Alicea subsequently submitted a letter detailing his criticisms of how the program was being administered locally and in San Juan. The letter suggested that "irregularities" (in Spanish, "irregularidades") existed in the program which were resulting in a backlog in the processing of applications and creating a danger of overpayments and underpayments. The letter also suggested a number of possible remedies, including doubling the number of social workers. Copies of the letter were sent to Alicea's superiors, including the Secretary of Social Services in San Juan, the appellant Ramon Garcia Santiago.

After receiving the letter, the Secretary summoned Alicea and his supervisors to a meeting which took place June 20, 1975. According to the Secretary and one of the supervisors who testified at trial, Alicea was unable to explain what "irregularities" attended the food stamp program beyond pointing to routine administrative problems. When cautioned to be more careful in his choice of terms in the future, Alicea reportedly grew angry and shouted disrespectfully at the Secretary. Alicea's version of the meeting has the Secretary angry from the outset, purportedly in a fit of pique at Alicea's mild criticisms of his agency. According to Alicea, the Secretary berated him at length, accusing him of trying to sabotage his administration.

About a month after the meeting Alicea, who was on sick leave, received a letter from the Secretary informing him that he was being transferred to Bayamon to handle adoption matters effective August 1, 1975. Alicea wrote immediately to the Secretary requesting an explanation but never received a reply. Although his illness ended shortly after receiving the letter, Alicea never reported to Bayamon. A month after he was scheduled to begin work at Bayamon, Alicea filed the present action in the district court. He alleged that the transfer violated his first and fourteenth amendment rights and prayed for an injunction and damages. In February 1976, six months after the effective date of Alicea's transfer, the district court determined that the Secretary's action violated Alicea's first amendment rights. The court found that the only reason for the transfer was that plaintiff wrote the letter. It went on to find,

"There was need of extra personnel in Bayamon but Barranquitas did not have enough personnel either. If transfer of social workers to Bayamon was necessary, there were others who were qualified, but there was no one in the Barranquitas office qualified under Personnel regulations to fill the post of District Director. As of the date of the trial no

* Of the Eighth Circuit, sitting by designation.

** Of the Fifth Circuit, sitting by designation.

one has been permanently assigned to the Barranquitas office as District Director.

. . .

"The transfer was a demotion, and by reason of Plaintiff's circumstances, is in effect a discharge. . . .

" . . . Not only was the transfer a demotion and/or a discharge, it was also punitive. It was ordered solely for the purpose of reprimanding Plaintiff."

The court ordered Alicea reinstated at Barranquitas, with his seniority rights, etc., intact. The court conducted further proceedings in May 1976 on the issue of damages. It found it to be "unworthy of belief" that one in the position of responsibility held by the Secretary "would have acted upon the information he had in the manner he did", and that "in demoting and/or discharging" the plaintiff, he "did so deliberately and maliciously to punish the Plaintiff for exercising his constitutionally protected right of freedom of expression". Because appellant acted "purposely and with malice in depriving the Plaintiff of his federally protected rights", the court ruled, *citing Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), that any qualified immunity was negated. The court awarded damages of $7,479 to compensate Alicea for wages lost "as a result of the action taken against him." The court also awarded $10,000 for "moral damages and mental distress", and another $10,000 for punitive and exemplary damages. And finally it awarded attorney's fees in the amount of $3,000.

■ We are persuaded that the district court did not err in its application of first amendment principles in this case. Subject to the state's paramount interest as an employer, in promoting the efficiency of the public services it performs through its employees, a public employee has a right, protected by the first amendment, to comment upon matters of public concern related to his employment. *Jannetta v. Cole*, 493 F.2d 1334 (4th Cir. 1974). *See Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). We need not decide whether a purely private letter to

one's superior is so protected; here the letter, while not publicized, was circulated among a number of members of the department, and the court found that the Secretary "was concerned with the publication of the letter or its falling into the hands of the media." Had Alicea leveled his criticisms with malice or knowledge that they contained falsehoods, he might constitutionally be punished. *Pickering, supra* at 574–75; *Hanneman v. Breier*, 528 F.2d 750, 755 (7th Cir. 1976). But it was not established that Alicea acted in bad faith. Nor, alternatively, were there showings by the Secretary that there was a strong need for confidentiality regarding the administration of the food stamp program which had been breached by the letter, *cf. Hanneman, supra* at 754–55, or that the letter caused a "significant interference with the efficient operation of the department", *Jannetta, supra* at 1337, such as might be true if Alicea had launched a personal attack upon his superiors or co-workers. *Pickering, supra* at 468–70, *cf. Sprague v. Fitzpatrick*, 546 F.2d 560, 564–65 (3d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977). The Spanish word, "irregularidades", may, to be sure, connote derelictions and fraud; but it was not applied to the Secretary or to other officials. Alicea seems to have meant that inefficiency and other agency problems would encourage fraudulent practices by food stamp recipients. The district judge, who could appraise "irregularidades" from the Spanish viewpoint could not understand the Secretary's reaction to the letter—which had been written at the suggestion, in the first instance, of Alicea's superior. The letter was not so threatening to discipline, nor otherwise disruptive, as to interfere with departmental efficiency.

■ Furthermore, we find adequate support in the record for the district court's findings that the transfer was solely in retaliation for the letter. The Secretary's testimony was, to say the least inconsistent. He attempted to justify the transfer both on grounds that a Social Worker V was needed in Bayamon to handle adoption mat-

118

ters and that Alicea was incompetent and immoral. The Secretary, of course, was entitled, insofar as the United States Constitution is concerned, to transfer Alicea for any reason, or for no reason, so long as he did not act to punish protected expression. However, as the latter charges were neither substantiated nor had been officially leveled—although some were, if true, so serious as to have required immediate dismissal—the court was entitled to disregard them as contrivances. Nor do we see that the letter reflected on its face Alicea's ineptness or incompetency, as the Secretary claims. The first amendment does not protect an employee who has revealed his incompetencies in writing, as by submitting an inept report. But such was not the case here. The court was warranted in concluding that the Secretary had taken unreasonable offense at what was written and had acted to punish Alicea solely for that reason.[1] *See Mt. Healthy Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *cf. Tinker v. Des Moines Community School District,* 393 U.S. 503, 509, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). As we do not find clear error in the findings, they must stand. Fed.R.Civ.P. 52(a).

We leave undisturbed the district court's award of attorney's fees. The court based the award on the alleged "bad faith" of the Secretary but we do not rest our affirmance on that ground, and doubt that we could properly do so. As we repeatedly have said, there is no parallel between the "obstinacy" standard prevailing in local Puerto Rican actions and the American common law "bad faith" standard. *See, e. g., F. F. Instrument Corp. v. Union de Tronquistas de Puerto Rico,* 558 F.2d 607, 610 n. 3 (1st Cir. 1977); *Cordeco Development Corp. v. Santiago Vasquez,* 539 F.2d 256, 262 (1st Cir.), *cert. denied,* 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976). However, since the entry of judgment in this case Congress has provided that a district court, in its discretion, may award attorney's fees to a prevailing party in certain civil rights actions. Act of Oct. 19, 1976, Pub.L. No. 94–559, § 2, amending 42 U.S.C. § 1988. This statute applies to cases on the appellate docket at the time of its enactment. *Martinez Rodriguez v. Jimenez,* 551 F.2d 877 (1st Cir. 1977). We therefore affirm the award of attorney's fees in this case, which we find to be in a not unreasonable amount.

In awarding damages for Alicea's lost wages and for his mental distress during his unemployment,[2] the district court

---

1. The Secretary argues that the district court erred in finding a first amendment violation stemming from Alicea's sending of the letter to the Secretary since this issue was not mentioned in a proposed pre-trial order stipulating that the only first amendment issue to be tried was whether Alicea was transferred to punish him for his political views. It is true that the evidence which served as the basis for the district court's finding of a first amendment violation was first mentioned during cross-examination. However, the Secretary did not object to the development of this evidence during the hearing. Nor did he suggest to the district court either before or after the injunction was issued that the court's findings had gone beyond the issues stipulated to. And on appeal, the Secretary does not suggest how the belated development of this issue prejudiced him. In these circumstances, we cannot say that the district court erred in considering whether the letter prompted the violation of Alicea's first amendment rights.

2. The district court recognized that the Secretary had a limited "good faith" immunity to

damages liability, but held that the immunity was overcome because of his malice and the evidence of deliberate wrongdoing. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 233, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Since 1968, at least, it has been settled that public employees' speech concerning issues affecting their employment is protected by the first amendment. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Given the findings of the district court concerning the Secretary's intentions and the large amount of case law since the *Pickering* decision, it was proper for the court to conclude that Alicea was punished "for exercising a well established and well known constitutional right." *Jannetta v. Cole,* 493 F.2d 1334, 1338 (4th Cir. 1974). *See Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. 992. Our only criticism of the court's reasoning on the immunity issue is that it seems to have thought that immunity applied only to punitive damages. Had the Secretary's immunity claim been valid-

found that Alicea was justified in refusing to go to Bayamon, on grounds that he was constructively discharged:

"The transfer was a demotion, and by reason of Plaintiff's circumstances, is in effect a discharge. The technical rating of Social Worker V, may have been the same but there is no question that in title, prestige and duties, the job of District Director holds a higher place in the Departmental hierarchy. There was also a pay differential because no allowance was made for per diem or travel expenses or for the extra travel time which is close to 4 hours daily."

A "constructive discharge" has been defined as "an onerous transfer, having the purpose and effect of forcing the transferred employee to quit the employment." *Newspaper Guild of Boston v. Boston Herald-Traveler Corp.,* 238 F.2d 471, 472 (1st Cir. 1956). In a like vein, the National Labor Relations Board has said, the

"burden imposed upon the employee must cause, and be intended to cause, a change in his working conditions so difficult or unpleasant as to force him to resign."

*Crystal Princeton Refining Co.,* 222 N.L. R.B. 1068, 1069 (1976). It is reasonable to apply a similar if not altogether identical concept in determining whether a public employee's punitive transfer, found to be in violation of first amendment rights, was tantamount to a dismissal, entitling the employee to the same damages he would have received had he actually been discharged. Unless the transfer is, in effect, a discharge, the employee has no right simply to walk out; he must accept the orders of his superior, even if felt to be unjust, until relieved of them by judicial or administrative action. Were this not so, a public employee would be encouraged to set himself up as the judge of every grievance; and the public taxpayer would end up paying for periods of idleness while the grievance was being adjudicated.

The district court recognized this in a general sense, but we are not clear what standard it applied in determining whether Alicea was effectively discharged. Before a "constructive discharge" may be found, entitling the employee to quit working altogether rather than accepting a transfer which he thinks is violative of his constitutional rights, the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. The standard to be applied is comparable to the doctrine of avoidable consequences which is applicable to situations where a public employee has been unlawfully discharged. *McKenna v. Comm'r of Mental Health,* 347 Mass. 674, 675–76, 199 N.E.2d 686 (1964). According to this doctrine, damages are not recoverable for harm that a wrongfully discharged employee could have foreseen and avoided by reasonable effort. Restatement of Contracts § 336 (1932). The employee cannot recover damages for losses that he could have avoided without risk of substantial loss or injury. Where a large loss could have been avoided by the expenditure of a relatively small amount of time, effort, and money, damages for that loss are not recoverable. 5 Corbin On Contracts § 1042 at 268 (1964). As a wrongfully discharged employee must use "honest, earnest and intelligent efforts" to mitigate his losses,[3] so must a wrongfully transferred employee. Neither can remain voluntarily idle and then expect to be recompensed merely because of an employer's illegal action.

Insofar as the district court rested its findings of constructive discharge on the loss of prestige entailed in the transfer, we think it erred. In Bayamon, Alicea would have handled duties appropriate for a social worker of his rank. To be sure, he would not have been in charge of an office, as had been true at Barranquitas. But this sort of limited blow to one's pride or prestige does

---

ly grounded, it would have shielded him from actual as well as punitive damages.

3. *McKenna v. Comm'r of Mental Health,* 347 Mass. 674, 675–76, 199 N.E.2d 686, 687 (1964).

not provide reason enough to resign during whatever period may be required to seek judicial or administrative relief. A more drastic reduction in the quality of working conditions is needed.[4] The court also pointed to the added commuting time and costs. Doubtless a drastic increase in commuting time and unreimbursed costs might at some point become sufficiently onerous to justify an employee in quitting.[5] We question, however, whether the added commuting time required by the transfer amounted to such a burden that Alicea was justified in refusing to report to Bayamon. It was a 15 minute drive to Barranquitas from his home and it may be judicially noted that the distance from Barranquitas to Bayamon by one of several routes is from 25 to 30 miles. There was testimony that in heavy rush hour traffic, the trip might consume nearly two hours each way, but that figure seems extreme. In any case, it is not uncommon for persons to commute such a distance voluntarily. Furthermore, there was evidence that Alicea may often have driven larger distances several times a week while working at Barranquitas.[6]

While we are not clear that an appropriate standard was applied nor that the inconveniences suffered do in fact meet such a standard, we think the issue—which is a factual question better suited to determination in the district court than here—should be remanded for reconsideration in light of the standards discussed herein. Should it be found that Alicea's transfer did not amount to a constructive discharge, he would not be entitled to recover damages for lost wages as he had a duty to remain on the job collecting his regular pay until relief from the Bayamon assignment was afforded by legal process. We remand the case on the issue of damages for lost wages so that the district court can address itself specifically to this issue, and especially to the commuting burdens imposed by the transfer and whether they would have led a reasonable person to resign until relief was secured.

The district court also found that Alicea incurred damages of $10,000 representing his "moral damages" and mental distress during unemployment. This amount is clearly excessive in light of the evidence which showed that, at most, Alicea felt some pressure and embarrassment before his friends, neighbors and family. Equally important, the damages for mental suffering are largely derivative of his

4. Humiliation usually justifies an unlawfully discharged employee's lack of mitigation efforts only in cases where the effort would involve almost daily, face to face dealings with the alleged wrongdoer or where the nature of the substituted job is unreasonably inferior to his prior position. 11 Williston On Contracts § 1353 at 279 (3d ed. 1968).

Neither of the above-mentioned situations seem to represent the case here. The district court's findings indicate that although Alicea would lose his title as director as a result of the transfer, his job classification would remain the same. Furthermore, by accepting the new position he would not have had to give up any policy making responsibilities because the court found that he had had none before. Finally, his salary was not decreased except indirectly by the fact that commutation would cost him more. Therefore, it does not appear that Alicea's position upon his transfer would have been "essentially different" or of a "different general character" than the one he had held before. Restatement (Second) of Agency § 455 Comment d (1958); 11 Williston On Contracts § 1359 (3d ed. 1968). The circumstances surrounding Alicea's transfer appear to be similar to but less drastic than a situation where a secretary, wrongfully discharged, cannot find another secretarial position but can immediately procure a position as a typist. In this situation the secretary's damages should be diminished by the amount he or she would have obtained as a typist. Restatement (Second) of Agency § 455 Comment d, Illustration # 1 (1958). Therefore, unless on remand the district court should find that the nature of the transferred position would have been significantly more demeaning to a reasonable person in Alicea's shoes than has appeared so far, Alicea's refusal to accept the transfer cannot be considered to be a "constructive discharge" on this ground.

5. See, e. g., American Trading Co. v. Steele, 274 F. 774, 783 (9th Cir. 1921), and San Antonio & A. P. Ry. Co. v. Collins, 61 S.W.2d 84, 89 (Tex.1933), where the courts held that there was no duty to mitigate if it meant moving to another state or country or having to change one's place of residence.

6. See Restatement (Second) of Agency § 455 Comment d, Illustration # 3 (1958).

claimed right to treat the transfer as a constructive discharge. Much of Alicea's evidence turned on his embarrassment and humiliation at having to remain home. All of this could have been spared him, however, had he temporarily commuted to Bayamon, in which event he would have received his regular salary. Unless it is found that Alicea was justified in refusing to report to Bayamon, his claim for damages from mental suffering during his unemployment must, in large measure, fail. If, on the other hand, it is found on remand that his transfer amounted properly to a constructive discharge, he would be entitled to recover lost wages and the district court could also consider awarding him damages for mental distress, although in a lesser amount than $10,000. *See Guzman v. Western State Bank*, 540 F.2d 948, 953 (8th Cir. 1976); *Seaton v. Sky Realty Co.*, 491 F.2d 634, 637–38 (7th Cir. 1974). *Donovan v. Reinbold*, 433 F.2d 738, 743 (9th Cir. 1970).

■ We reverse the award of $10,000 in punitive damages. There is authority that a district court may award punitive damages where, in its discretion, it finds that the award is justified by the defendant's "bad faith". *See Donahue v. Staunton*, 471 F.2d 475, 482 (7th Cir. 1972), *cert. denied*, 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973). Most courts agree, however, that intentional interference with constitutional rights, standing alone, is not enough; there must also be "aggravating circumstances". *E. g., Silver v. Cormier*, 529 F.2d 161, 163 (10th Cir. 1976). This court has sustained an award of punitive damages where police officers' repeated, warrantless searches of plaintiffs' home were termed an "outrageous invasion of . . . privacy". *Caperci v. Huntoon*, 397 F.2d 799, 801, *cert. denied*, 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968). The Eighth Circuit has stated that "oppression, malice, gross negligence, willful or wanton misconduct, or a reckless disregard for the civil rights of the plaintiff" would justify punitive damages. *Guzman, supra* at 953. And the Third Circuit has described the standard as "malicious and wanton disregard" of a plaintiff's

rights. *Paton v. LaPrade*, 524 F.2d 862, 872 (1975). We think that the district court's discretion should also be guided by considering whether actual damages would not suffice to deter a defendant's wrongdoing. *Cf. Lee v. Southern Home Sites Corp.*, 429 F.2d 290, 294 (5th Cir. 1970).

■ In the present case, the district court found that the defendant "acted in bad faith, deliberately and with malice. Even after returning to work under order of this Court, Plaintiff was not paid his salary for two months . . . ." We do not, however, think that Alicea's delay in receiving his paychecks upon resuming work are probative of the degree of the Secretary's bad faith. Alicea's testimony indicated only that he had experienced the delay and there is no evidence showing that the Secretary either ordered or acquiesced in the delay as a punishment of Alicea. With respect to the Secretary's role in the transfer, the wrong visited on Alicea is far less egregious than the inflictions of physical or psychological harm which have generally been held to justify punitive damages. *Compare Caperci, supra* with *Gieringer v. Center School District*, 477 F.2d 1164, 1167 (8th Cir.), *cert. denied*, 414 U.S. 832, 94 S.Ct. 165, 38 L.Ed.2d 66 (1973). And while the Secretary apparently confused vindication of his personal pride with a proper exercise of his official responsibilities, that motivation alone is not the sort of malice which has usually been held to support punitive damages. While accepting the court's view that the Secretary exceeded his limited immunity for official actions, we are not satisfied that this is a case where punitive damages, in addition to actual damages, are warranted. An award of actual damages coupled with reinstatement to the Barranquitas position is ample relief from the Secretary's misconduct and a sufficient deterrent to future wrongdoing. We add that the court's injunction ordering reinstatement, which we affirm, is not to be read as limiting plaintiff's superiors from lawfully transferring him to whatever extent Puerto Rican law allows so long as the transfer is not based, as it was here, on a constitutionally impermissible reason.

*Affirmed in part; vacated in part; reversed in part. Remanded for further proceedings in accordance herewith. No costs.*