**Juan Fumero SOTO, Plaintiff,**

**v.**

**Carlos CHARDON et al., Defendants.**

Civ. No. 79–198.

United States District Court,
D. Puerto Rico.

May 7, 1981.

Hiram Cancio, Jaime R. Nadal Arcelay, Jesus R. Rabell Mendez, Blanca Mera Roure, and Cancio, Nadal & Rivera, Hato Rey, P.R., for plaintiff.

Robert Cordova, Sally de Jesus Kellogg, San Juan, P.R., Ines Equia Miranda de Casanova, Puerto Rico Dept. of Justice, San Juan, P.R., for defendants.

## MEMORANDUM

GRANT, Senior District Judge, sitting by designation.

■ Fifty-five school teachers and administrators, plaintiffs in these 55 consolidated cases, brought individual suits charging that they were unlawfully discriminated against and demoted due to their association with and membership in the Popular Democratic Party (PDP), a political party in the Commonwealth. Each plaintiff's theory is that Carlos A. Chardon, then Secretary of Education for the Commonwealth, and his Assistant Secretary for Personnel, Oscar Ramos, members of the governing New Progressive Party, unlawfully demoted each of the plaintiffs at dates ranging from May till June of 1977, in violation of the First and Fourteenth amendments, 42 U.S.C. § 1983, and various Puerto Rican statutes.

18 L.P.R.A. §§ 249e,[1] 211 and 214 *et seq.* Actions under Puerto Rican law come within both § 1983 and its jurisdictional predicate, 28 U.S.C. § 1343(3). *Examining Board of Engineers v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). It is impermissible to discriminate in the work place based upon a person's political affiliations. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).[2] These suits were brought against Chardon and Ramos in their individual and official capacities.[3]

Before trial, the individual plaintiffs, each represented by the same group of attorneys, indicated that a large portion of their proof at trial would consist of establishing a pattern of unlawful discrimination, requiring repetitious testimony from a number of plaintiffs. Inasmuch as the factual and legal issues, the attorneys and the parties were common to all these cases, these suits were ordered consolidated pursuant to Fed.R.Civ.P. 42(a). Subsequently, other judges in this district transferred a number of "Chardon" cases for inclusion in the consolidated trial. This trial was bifurcated, and was to consider only the liability issues. Fed.R.Civ.P. 42(b). *See* Court Order, January, 1981. In essence, the jury's findings on the issue of liability in this captioned case was made binding upon the parties in all of the consolidated cases. The damages issues were not consolidated.

Each of the plaintiffs herein was demoted from the position of school principal or other supervisory position in which he or she did not have tenure. Upon demotion as ordered by the Department he or she was returned to the tenured position as school teacher or to lesser administrative rankings,

---

1. 18 L.P.R.A. § 249e prohibits school officials from making personnel changes based on an employee's political affiliation.

2. The affirmative defense that the plaintiffs were confidential or policymaking employees, and hence, not protected from discharge, was *not raised as an issue in this case.*

3. Since Chardon resigned as Secretary before trial, the new Secretary of Education is automatically substituted in her official capacity for Chardon, Fed.R.Civ.P. 25(d). The caption has not been formally changed to reflect this. Chardon, of course, remains a defendant in his individual capacity.

as previously occupied. No one was discharged. While the complaints of most teachers requested declaratory relief, reinstatement, back pay and punitive damages, approximately ten to fifteen suits were filed by teachers who chose to leave the Department during the pendency of these lawsuits. These ex-teachers were no longer interested in the equitable relief of reinstatement, but in turn sought a more substantial monetary judgment than those who remained employees of the Department.

These cases were tried to a jury. With the agreement of counsel, the following instruction was given pertaining to the defendants' affirmative defense that they had acted in good faith while demoting each plaintiff, and thus were protected by a qualified official immunity:

We have made reference to the affirmative defense of good faith and a qualified immunity.

The jury is instructed that the defendants were each public officials of the Commonwealth of Puerto Rico. They were acting in their official capacity at all times pertinent to this case.

And, as such, they did enjoy a qualified immunity that protects them if they acted with a good faith belief based upon reasonable grounds that their actions were necessary.

It is the existence of reasonable grounds for the belief formed and acted upon at the time, and in light of all the circumstances, coupled with a good faith belief, that affords a basis for a qualified immunity of State officials for acts that are performed in the course of their official conduct.[4]

The Commonwealth officials who are defendants in this case are not immune from liability for actions taken under Section 1983 if that official knew or should have known that the action taken within his sphere of official responsibility would violate the Constitutional or legal rights of the teachers affected, *or if the official took the action with the malicious intention of causing a deprivation of Constitutional or legal rights or other injury to the teachers.*[5] (emphasis added).

The jury returned a verdict for the plaintiff and against each defendant. The Court then defined malicious intent,[6] and requested that the jurors return to their deliberations to answer the following interrogatory:

Following a finding by the jury that the defendants Carlos Chardon and Oscar Ramos, individually and in their official capacities are liable to the plaintiffs in this consolidated cause, the jury is now instructed to deliberate further for the sole purpose of answering this question: Did the defendant Carlos Chardon *have a malicious intent to deprive plaintiffs of their constitutional or other rights?*

And a similar question with respect to the other defendant: Did the defendant Oscar Ramos *have a malicious intent to deprive the plaintiffs of their constitutional or other rights?* (emphasis added).

The jurors answered "No" with respect to each defendant. No objection was made regarding this interrogatory. It is noted here that the language in the prior charge and the special interrogatory is identical. The Court now must give effect, if possible, to both the general verdict for plaintiff, and the interrogatory answer that defendants lacked malicious intent.

### (I) *Punitive Damages*

The Supreme Court has construed 42 U.S.C. § 1983 to allow an award for com-

---

4. This paragraph is taken from *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974).

5. This paragraph is taken from *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000 · 1001, 43 L.Ed.2d 214 (1975).

6. I am going to read to you a definition from a couple of cases as to what that constitutes.

"Malice is the intentional doing of a wrongful act without just cause or excuse with an intent to inflict an injury or under circumstances that the law will imply an evil intent."

And the other, from the other case, I read as follows: "Maliciousness does not necessarily mean actual malice or ill-will, but intentional doing of a wrongful act without legal or social justification."

pensatory damages. It has not, as yet, definitively ruled as to whether punitive damages are also available:

> To the extent that Congress intended that awards under § 1983 should deter the deprivation of constitutional rights, *there is no evidence that it meant to establish a deterrent more formidable than that inherent in the award of compensatory damages.* See *Imbler v. Pachtman,* 424 U.S. 409 at 442, 96 S.Ct. 984 at 1000, 47 L.Ed.2d 128 (White, J., concurring in judgment).

*Carey v. Piphus,* 435 U.S. 247, 256–57, 98 S.Ct. 1042, 1048–1049, 55 L.Ed.2d 252 (1978) (emphasis added) (footnote omitted). The footnote following this holding further explained the Court's position:

> *This is not to say that exemplary or punitive damages might not be awarded in a proper case under § 1983 with the specific purpose of deterring or punishing violations of constitutional rights.* See, e. g., *Silver v. Cormier,* 529 F.2d 161, 163–164 (CA10 1976); *Stengel v. Belcher,* 522 F.2d 438, 444 n.4 (CA6 1975), cert. dismissed, 429 U.S. 118 [97 S.Ct. 514, 50 L.Ed.2d 269] (1976); *Spence v. Staras,* 507 F.2d 554, 558 (CA7 1974); *Caperci v. Huntoon,* 397 F.2d 799, 801 (CA1), cert. denied, 393 U.S. 940 [89 S.Ct. 299, 21 L.Ed.2d 276] (1968); *Mansell v. Saunders,* 372 F.2d 573, 576 (CA5 1967); *Basista v. Weir,* 340 F.2d 74, 84–88 (CA3 1965). Although we imply no approval or disapproval of any of these cases, we note that there is no basis for such an award in this case. *The District Court specifically found that petitioners did not act with a malicious intention to deprive respondents of their rights or to do them other injury, see n.6, supra, and the Court of Appeals approved only the award of "nonpunitive" damages, 545 F.2d 30, 31 (1976).*

We also note that the potential liability of § 1983 defendants for attorney's fees, see Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. 94–559, 90 Stat. 2641, amending 42 U.S.C. § 1988, provides additional—and by no means inconsequential—assurance that agents of the State will not deliberately ignore due process rights. See also 18 U.S.C. § 242, the criminal counterpart of § 1983.

*Id.* at 257 n.11, 98 S.Ct. at 1049 n.11 (emphasis added).

The Court of Appeals for the First Circuit has held that punitive damages are available against § 1983 defendants "when there are aggravating circumstances." *Fact Concerts, Inc. v. City of Newport,* 626 F.2d 1060, 1067 (1st Cir. 1980), citing *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 121 (1st Cir. 1977) (bad faith) and *Caperci v. Huntoon,* 397 F.2d 799, 801 (1st Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968) (unwarranted invasion of privacy). In *Rosado, supra,* it was stated: "[I]ntentional interference with constitutional rights, standing alone, is not enough; there must also be 'aggravating circumstances.'" 562 F.2d at 121. Citing the standards used by other circuits, the *Rosado* court continued: "and the Third Circuit has described the standard as 'malicious and wanton disregard' of a plaintiff's rights." *Id.* (citation omitted).

██ The jury's answer to the interrogatories in this case ended any claim for punitive damages. As the plaintiff's attorneys acknowledged, the award of punitive damages is a decision for the trier of fact. Although the parties failed to raise the issue, any decision granting or denying punitive damages must include an assessment of the conduct in question, evidentiary inferences and evaluations pertaining to motive and knowledge. *Alicea Rosado v. Garcia Santiago, supra.* See also *Lee v. Southern Home Sites Corp.,* 429 F.2d 290, 294 (5th Cir. 1970). *See also* Annot., 14 A.L.R.Fed. 608 (1970). It became apparent that failure to have questioned this liability jury regarding the defendants' intent would have required a full repetition of the liability trial testimony in any subsequent trial on the issue of punitive damages. However, based upon the jury's findings, no punitive damages can now be awarded. With this in mind, the Court will now address defendants' contention that the jury's interrogatory answers unwittingly opened the door to an inconsistent verdict.

**(II)** *The Motion for Judgment Notwithstanding the Verdict*

Defendants moved for a directed verdict at the close of the evidence offered by plaintiff, and again at the close of defendants' evidence on the official immunity defense. The Court reserved its decision upon that motion. After the jury's answer that defendants lacked a malicious intent, defendants moved for judgment notwithstanding the verdict. Defendants contend that these answers entitle them to prevail in their affirmative defense of qualified immunity, and that the general liability verdict is contradicted by the interrogatory answers to the effect that defendants had no malicious intent. In the alternative, they claim as a matter of law that the answers bar any subsequent claim for damages from the individual defendants.

■ The Court is not persuaded in the first instance that the findings are contradictory. To that extent, judgment notwithstanding the verdict is denied. The Court is persuaded, however, that the jury's answers do preclude the award of damages against the defendants in their individual capacity based upon an independent question of law.

■ The standard for ruling on a motion for judgment notwithstanding the verdict is the same as the standard for a directed verdict motion. The district court is to review the evidence in the light most favorable to the prevailing party, giving the plaintiff here the benefit of all the factual inferences that the evidence fairly supports without weighing the credibility of the witnesses. Fed.R.Civ.P. 50(b). *Fact Concerts, Inc. v. City of Newport, supra,* 626 F.2d at 1064. *See also Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–235, 88 L.Ed. 239 (1943). Reviewing the testimony presented in this case by that standard, the Court cannot conclude that the evidence presented was insufficient to permit a rational jury from reaching both the verdict of liability and finding on the lack of malicious intent. Therefore, under the applicable standard the Court must effectuate both the general verdict and interrogatory answers. At this point, however, the Court must state its view of the evidence that was presented. The evidence of political discrimination and the defendants' personal involvement in the demotions was not overwhelming. Candidly, a reasonable man could have found the plaintiff's proof unconvincing. The Court will not invade the jury's province to substitute its credibility determinations and reach an alternative judgment. But in this case the jury had two bites of the apple so to speak, and both must be harmonized by the Court, if possible, under a fair reading of the answers. Fed.R.Civ.P. 49(b). *See Gallick v. Baltimore & Ohio Railroad Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963).

Fed.R.Civ.P. 49 and the cases which construe it indicate that, "[W]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962). Although that case discussed Rule 49(a), while this case arises under Rule 49(b), the principles expressed remain equally valid. In fact, if the difference between the general verdict and interrogatory answers is perceived as possibly inconsistent, the general admonition is that the answers to special interrogatories should control, rather than the general verdict.[7] The power to enter judgment on findings inconsistent with the general verdict "is a constitutional one and does not violate the Seventh Amendment since the jury's findings of fact are not being reex-

---

**7.** *Blackwell v. Cities Service Oil Co.,* 532 F.2d 1006 (5th Cir. 1976); *Nimnicht v. Dick Evans, Inc.,* 477 F.2d 133 (5th Cir. 1973); *Elliott v. Watkins Trucking Co.,* 406 F.2d 90, 92 (7th Cir. 1969); *United Air Lines, Inc. v. Wiener,* 335 F.2d 379, 406-07 (9th Cir.), *cert. dismissed,* 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964); *United States v. City of Jacksonville, Arkansas,* 257 F.2d 330 (8th Cir. 1958); *Golden North Airways, Inc. v. Tanana Publishing Co.,* 218 F.2d 612 (9th Cir. 1954).

amined but, as a reasonable regulation of practice, their more specific findings of fact are allowed to control their general conclusion embodied in the general verdict." 5A Moore's Federal Practice ¶ 49.04; Wright and Miller, Federal Practice and Procedure: Civil § 2513. In summary, while harmonizing the answers the more general liability verdict must give way to the more specific lack of intent finding. This principle will be borne in mind when the qualified immunity issues are considered.

### (III) *Qualified Immunity from Damages*

#### A. *Liability*

The nature of the qualified immunity defense at common law and in § 1983 cases has been judicially established commencing with *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).[8] In *Scheuer*, the Governor of Ohio, the University President and National Guard officers involved in the Kent State University killings claimed absolute official immunity from damages under § 1983. This discussion is of particular significance in the case before us inasmuch as *Scheuer* addresses the scope of immunity available to state executive officials occupying positions of authority analogous to those held by the defendants here. The Court began by noting the reasons why officials had been held immune from suits for personal damages at common law:

> The concept of the immunity of government officers from personal liability springs from the same root considerations that generated the doctrine of sovereign immunity. While the latter doctrine— that the "King can do no wrong"—did not protect all government officers from *personal* liability, *the common law soon recognized the necessity of permitting officials to perform their official functions free from the threat of suits for personal liability.* This official immunity apparently rested, in its genesis, on two mutu-

ally dependent rationales: *(1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.* 416 U.S. at 239–40, 94 S.Ct. at 1687–1688 (emphasis added) (footnotes omitted).

In holding that a qualified official immunity exists, Justice Harlan's prior admonitions on this subject were restated, followed by the Court's holding.

> "To be sure, the occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to 'matters committed by law to his control or supervision,' *Spalding v. Vilas, supra*, [161 U.S. 483] at 498 [16 S.Ct. 631 at 637, 40 L.Ed. 780]—which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits. 360 U.S., at 573–574, [79 S.Ct. at 1340–1341]."

> *These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based.* It is the existence of reasonable grounds for

---

8. The Court has made clear that immunities under § 1983 are to be read in harmony with the general principles of tort immunities and defenses. *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976). *See also Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Id.* at 247–48, 94 S.Ct. at 1692 (emphasis added).

■ In this case, plaintiff concedes that a qualified official immunity clothed both Chardon and Ramos inasmuch as the Commonwealth's Secretary of Education is given practically limitless discretionary powers in the personnel area. 18 L.P.R.A. § 211 *et seq.* While this discretionary power cannot be used to ratify political discrimination in promotion and demotion policies, the *Scheuer* Court apparently contemplated a de facto "sliding scale" of qualified immunity protection for public officials. In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Court again confirmed that like the state cabinet officials and state governor in *Scheuer*, the federal cabinet appointee in *Butz* deserved the highest level of protection from suits against him, *i. e.*, below the level of absolute immunity. Implicitly, this requires a heightened degree of knowledge, personal participation and malice by the higher executive official in an allegedly discriminatory action. *See also Williams v. Anderson*, 562 F.2d 1081, 1101 (8th Cir. 1977).

*Scheuer* was followed by *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), which examined the scope of immunity for members of a school board in disciplinary proceedings. Essentially, the Court again sought to steer between the two weighty and competing concerns in this area—making public officials responsible for violating citizen's constitutional rights, without emasculating the officials' power, and will, to make difficult or unpleasant decisions when necessary. *See also Butz v. Economou, supra*, 438 U.S. at 503, 98 S.Ct. at 2909.

Comparing the *Scheuer* defendants with the *Wood* officials, the latter occupied much lower executive positions. The *Scheuer* analysis would indicate that a lesser degree of qualified immunity would be sufficient to protect the *Wood* defendants. The "variation" in the scope of the immunity accorded the officials in *Scheuer* was at a low ebb in *Wood v. Strickland* for this reason. In *Wood* the Court held:

Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 *if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional or other injury to the student.*

*Id.*, 420 U.S. at 322, 95 S.Ct. at 1001 (emphasis added).

■ In the present case, the jury was instructed, without objection, in accord with this dual *Wood* standard. Parsing this standard, the "should have known" language can be characterized as a negligence standard. It is an objective measure of the defendants' conduct, although the "knew" portion is subjective in the sense that it requires an examination of the defendants' state of mind. Via the conjunctive "or" the Court connected the second branch to the *Wood* standard, a subjective intent test which inquires whether the official maliciously intended to injure the plaintiff. Based upon the jury's answer to the special interrogatory, there was no such impermissible intent in this case. Therefore, the "knew or should have known" standard is the branch plaintiffs must depend upon here.

■ The compelling policy dilemma of the immunity decisions is the need to balance the plaintiff's compensation for injuries with the need to protect the decision making process. *Barr v. Mateo*, 360 U.S. 564, 565, 79 S.Ct. 1335, 1336, 3 L.Ed.2d 1434 (1959). To complicate any analysis under the *Wood* holding, however, the Court has left further instructions which must be integrated with the liability analysis.

## B. *Damages*

As noted in *Wood:*

*Liability for damages for every action which is found subsequently to have been violative of a student's constitutional rights and to have caused compensable injury would unfairly impose upon the school decisionmaker the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties.* School board members, among other duties, must judge whether there have been violations of school regulations and, if so, the appropriate sanctions for the violations. Denying any measure of immunity in these circumstances "would contribute not to principled and fearless decision-making but to intimidation." *Pierson v. Ray, supra,* 386 U.S., [547] at 554, 87 S.Ct., [1213] at 1218 [18 L.Ed.2d 288]. *The imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious school decisionmaker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school and the students.* The most capable candidates for school board positions might be deterred from seeking office if heavy burdens upon their private resources from monetary liability were a likely prospect during their tenure.

420 U.S. at 319–20, 95 S.Ct. at 999–1000 (emphasis added) (footnote omitted).

■ In addition to the *Scheuer* and *Butz* "sliding scale" of immunity, and the *Wood* liability standard, the Court has indicated here that merely satisfying the *Wood* liability test may not be sufficient to allow an award of *damages.* Once liability exists, damage awards still depend to some degree on the subjective determination of whether the official acted in good faith, *e. g.,* whether the "mistaken" constitutional deprivation is reasonable or unreasonable. Rather than only one standard by which to provide a readily discernible litmus test to judge official immunity, it is apparent from the Court's opinion that the analysis regarding

damages is more complicated. An official could make a "reasonable" mistake protected by official immunity, a mistake which might otherwise constitute an actionable violation of 42 U.S.C. § 1983.

■ The Court concluded the *Wood* analysis by making the following admonition regarding damages:

*A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.*

*Id.* at 322, 95 S.Ct. at 1001 (emphasis added).

Before evaluating the verdict and interrogatory answers in light of the *Wood* damage holdings, it appears that integrating these damage teachings with the liability standards yields a presumably unintended conflict. Under § 1983 and the *Wood* liability standard of "knew or should have known," liability can exist for non-deliberate conduct. However, in the absence of an impermissible motivation, or deliberate disregard for citizen's rights, damages should not be awarded. The conflict does not stem from faulty analysis, but is a product of the requirement that a balance be struck which protects both citizens and officials. In effect, qualified immunity protects officials like Chardon and Ramos from damages even when they objectively should have known that violations of constitutional rights were occurring, but where they took these actions in the absence of malicious or bad motivation. While a specific answer to the question of whether the mistake was "reasonable" or "unreasonable" would clearly answer this concern, no jury finding exists on that question.

■ Although the Supreme Court has specifically limited the *Wood v. Strickland* decision to the context of school discipline, *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), these damage teachings have been expanded upon and utilized in other areas. Rather

than slavishly utilizing the *Wood v. Strickland* decision, these cases indicate that the standard for awarding damages against officials is higher than mere negligence on the part of the official involved.[9]

The appropriate test, drawn from the Supreme Court's opinions, was stated by the Seventh Circuit in *Thomas v. Pate*, 516 F.2d 889, 891 n.2 (7th Cir.), *cert. denied*, 423 U.S. 877, 96 S.Ct. 149, 46 L.Ed.2d 110 (1975), and again restated as the holding of *Bonner v. Coughlin*, 545 F.2d 565, 568 (7th Cir. 1976) (en banc), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978) (footnote omitted):

> [A] plaintiff must prove that the defendant has acted within the sphere of his official responsibility, "with the malicious intention to cause a deprivation of constitutional rights or other injury to the [plaintiff] or "with such disregard to the [plaintiff's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."

Neither test is satisfied here. First, the jury finding that there was no malicious intent precludes the Court from finding the officials acted out of an impermissible motivation. Nor does the evidence presented at trial support such a proposition.

Second, plaintiff claims that defendants objectively acted with a deliberate disregard of his established constitutional rights, e. g., the employee's right not to be discharged for his political affiliations. As an example, plaintiff cites *McCormick v. Edwards*, 479 F.Supp. 295 (M.D.La.1979), where the district court ruled that public officials could not rely on their subjective claim that they had acted in good faith, while pleading ignorance of clearly established due process rights. The defendants in that case knew of the due process rights but claimed not to know these rights applied to the plaintiff. *Id.* at 299.

This type of analysis is not helpful in the case at bar where Chardon and Ramos have never claimed ignorance of the law, or of the teacher's right not to be discharged for his political affiliations. Defendants do not claim good faith in light of an unexpected, late-breaking constitutional doctrine as discussed in *Woods*. Their theory throughout this litigation has been that the demotions were for non-political reasons, and that their personal role in these decisions, particularly Secretary Chardon's, was extremely limited. Although plaintiff is correct in asserting that the right in question is a clear proposition of constitutional law it is proof of motive that is the key to unlocking this case.

 The burden of proving what can conveniently be analogized as the two-sided qualified immunity coin, with proof of the officials' good faith on one side, or proof of their bad faith on the other, has been seen as mutually exclusive propositions. The First Circuit succinctly stated this in *Gomez v. Toledo*, 602 F.2d 1018, 1020 (1st Cir. 1979), *rev'd*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980):

> It has now been firmly established by a long line of cases that in a civil rights action for damages, public officials acting in their official capacity enjoy a qualified immunity that protects them if they acted with a good faith belief based upon reasonable grounds that their actions were necessary. *Or to put it conversely,* a plaintiff in such an action must prove that the public official acted in bad faith, meaning with malice or recklessness. *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214

---

9. The Supreme Court has left open the question of whether negligence on the part of state officials is sufficient to constitute a constitutional violation. *See Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The cases collected in *Bonner v. Coughlin*, 545 F.2d 565, 568 n.8 (7th Cir. 1976) (en banc), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d

529 (1978), indicate the majority view is that mere negligence is not enough. The First Circuit holding is to that effect. *Page v. Sharpe*, 487 F.2d 567 (1st Cir. 1973). *See also Bogard v. Cook*, 586 F.2d 399 (5th Cir. 1978), *cert. denied*, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979).

(1975); *Scheuer v. Rhodes*, 416 U.S. 232 [94 S.Ct. 1683, 40 L.Ed.2d 90] (1974); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).[10]

(emphasis added).

In this case, defendants contend that the finding that they did not act with a malicious intent is tantamount to a finding that they acted in good faith. If such were the case, defendants would have succeeded in proving that they are clothed with a qualified immunity in this case. Likewise, plaintiff contends that the general liability finding constitutes a finding of bad faith in the objective sense, although they concede that the jury found the defendants did not have the subjective intent to deprive plaintiffs of their rights. Candidly, these admittedly less than definitive findings do not yield what either party would like them to. A finding that the defendants objectively "knew or should have known" discrimination was occurring may be sufficient for a general finding of liability but it does not satisfy the requirements for damages. Defendants proffered and the jury accepted proof that they did not act with a malicious intent. This does not, however, indicate that they acted in good faith.

The peculiar context of the present case simply does not permit the expected converse finding, discussed by the First Circuit, to occur. Instead, readily discernible elements of each alternative appear and can be rationalized to yield a coherent result. This result, however, convinces us that further legal damages cannot be awarded.

Further research disclosed a number of cases which leave the burden of proving good faith to the defendant officials. When *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) was remanded, the Second Circuit placed the burden on the police officers to show they had reasonable beliefs regarding the legality of their actions. 456 F.2d 1339, 1347–48 (2d Cir. 1972). *See also Thompson v. Burke*, 556 F.2d 231 (3d Cir. 1977); *Skehan v. Board of Trustees of Bloomsburg State College*, 538 F.2d 53, 61–62 (3d Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976); *Bryan v. Jones*, 530 F.2d 1210 (5th Cir.) (en banc), *cert. denied*, 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976); *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Safeguard Mutual Insurance Co. v. Miller*, 472 F.2d 732 (3d Cir. 1973); *Benford v. American Broadcasting Companies, Inc.*, 502 F.Supp. 1148 (D.Md.1980); *Fujiwara v. Clark*, 477 F.Supp. 822, 832 (D.Haw.1979); *Eckerd v. Indian River School District*, 475 F.Supp. 1350, 1368 (D.Del.1979); *Cameron v. Montgomery County Child Welfare Service*, 471 F.Supp. 761, 764 (E.D.Pa.1979); *Forsyth v. Kleindienst*, 447 F.Supp. 192, 202 (E.D.Pa.1978), *modified on other grounds*, 599 F.2d 1203 (3d Cir. 1979); *Eubanks v. Clarke*, 434 F.Supp. 1022, 1033–34 (E.D.Pa.1977); *Mack v. Johnson*, 430 F.Supp. 1139, 1147 (E.D.Pa. 1977), *aff'd*, 582 F.2d 1275 (3d Cir. 1978); *Burkhart v. Saxbe*, 397 F.Supp. 499, 502 (E.D.Pa.1975).

In this case, the burden of proof on the qualified official immunity defense was allocated to the defendants. This instruction

---

**10.** The Supreme Court has not passed upon the burden of proving, as opposed to pleading, the official immunity defense. The First Circuit originally had charged the plaintiff with the burden of pleading and proving bad faith on the part of the officials involved. *Gomez v. Toledo*, 602 F.2d 1021 (1st Cir. 1979). This decision was reversed by the Supreme Court which held that § 1983 plaintiffs did not have to anticipate what is an affirmative defense, *i. e.*, the good faith actions of the officials involved, by pleading that they acted in bad faith. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Justice Rehnquist concurred in the Court's otherwise unanimous opinion, but noted his belief that the burden of persuasion, apart from the burden of pleading, remained undecided.

The Court cited several cases to indicate that the burden of persuasion lies with the officials. *McCray v. Burrell*, 516 F.2d 357, 370 (4th Cir. 1975) (en banc), *cert. dismissed*, 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976); *Gilker v. Baker*, 576 F.2d 245 (9th Cir. 1978); cited in *Gomez v. Toledo*, 446 U.S. at 638 n.5, 100 S.Ct. at 1922 n.5. No contrary rulings were cited.

was accepted without protest by both parties. Therefore, they are bound by it. Fed. R.Civ.P. 51. *Weade v. Dichmann, Wright & Pugh, Inc.*, 337 U.S. 801, 808, 69 S.Ct. 1326, 1330, 93 L.Ed. 1704 (1949) (civil case); *Johnson v. United States*, 318 U.S. 189, 200, 63 S.Ct. 549, 554, 87 L.Ed. 704 (1943); *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936); 5A Moore's Federal Practice 51.04 at 51–28, 51–30 to 51–35; *Redmond v. Baxley*, 475 F.Supp. 1111, 1115 (E.D.Mich.1979).

If the proof of the parties is less than definitive upon the defense of qualified official immunity, then the policy concerns of *Scheuer* and *Wood*, the need to protect the decision making powers of public officials, particularly state cabinet members, comes to the fore. The case at bar presents at best ambiguous findings regarding the motivation these officers brought to this situation. In such an ambiguous case, where the Court can exercise its equitable powers to make plaintiffs whole, further damages are not warranted.

This comports with the Supreme Court's instructions regarding § 1983 damages. Although by its own terms § 1983 creates a species of tort liability that admits of no immunities, *Owen v. City of Independence, Missouri*, 445 U.S. 622, 650–51, 100 S.Ct. 1398, 1415–1416, 63 L.Ed.2d 673 (1980), qualified immunity for public officials has been a product not of legislation, but of "judicial thinking" upon the conflicting policies involved. *Butz v. Economou, supra*, 438 U.S. at 501–02, 98 S.Ct. at 2908. Applying this judicially created immunity in accord with the dictates of prior decisions, if damages are not limited we run the risk of "dampen[ing] the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Learned Hand, Judge).

█ Where the Supreme Court has considered the role of damages as compensation for violations of constitutional rights, it has indicated that restraint is recommended. Absent congressional authorization, a court may also be impelled to think more carefully about whether the type of injury sustained by the plaintiff is normally compensable in damages. *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Justice Harlan further noted, "[F]or people in Bivens' shoes it is damages or nothing." *Id.* at 410, 91 S.Ct. at 2012. That is not the case here. As will become clear, the plaintiffs here can be given the bulk of the relief sought via equity, without infringing upon the policy concerns discussed by the Court in the qualified official immunity cases. Because that is the case, the efficacy of protecting the official's decision making power deserves full concern, in accord with the teachings of the Supreme Court. For these reasons, no further proceedings to establish damages are necessary, nor can any be awarded in this case.

(IV) *Injunctive Relief*

While the scope of the qualified immunity defense prohibits the further award of damages, the question of whether equitable relief may be granted poses an entirely different issue. The dominant policy concern which prohibited damages, *i. e.*, the potential chilling effect upon decision makers, is no longer present. The impact that this has on the efficacy of allowing relief was touched upon, albeit briefly, by the Court in *Wood v. Strickland*, 420 U.S. at 314–15 n.6, 95 S.Ct. at 996–997 n.6, which stated in part, "[I]mmunity from damages does not ordinarily bar equitable relief as well."

A more definitive examination of this reasoning can be found in *Rowley v. McMillan*, 502 F.2d 1326 (4th Cir. 1974). In that case, a class action filed by persons arrested, assaulted, and expelled from a speaking engagement of then President Nixon, sought declaratory relief against similar actions in the future. The district court found the law enforcement officers involved had no constitutional basis for their actions, and granted a preliminary injunction on plaintiff's behalf. The Court of Appeals rejected the officials' defense of qualified official immunity. Referring to

*Barr v. Mateo* and *Scheuer v. Rhodes* (the same portions of which have been restated again in this memorandum, *supra*) the Fourth Circuit indicated its reasons for upholding injunctive relief:

> These two quotations demonstrate that the immunity rule, whatever its scope, is grounded upon the inhibitory effect of suits for money damages. Manifestly, actions for injunctive relief do not have that effect. The federal defendants have cited no case, and we have found none, which holds that the immunity doctrine insulates a public official or public employee from injunctive relief to prevent what would otherwise be an illegal act on his part. *Scheuer* states that the immunity doctrine stems from the same considerations that generated the doctrine of sovereign immunity. That immunity is embodied in the eleventh amendment, so that it is significant to note that since *Ex Parte Young*, 209 U.S. 123 [28 S.Ct. 441, 52 L.Ed. 714] (1908), the law has been settled that, notwithstanding the eleventh amendment, in an appropriate case a state official may be enjoined by a federal court from future violation of federal law.
>
> Thus, we conclude that the preliminary injunction is not vulnerable to the claim of official immunity.

*Id.* at 1332.

The reasoning in *Rowley v. McMillan* is followed by *Stanford Daily v. Zurcher*, 550 F.2d 464 (9th Cir. 1977), *rev'd on other grounds*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). *See also Jacobson v. Tahoe Regional Planning Agcy.*, 566 F.2d 1353 (9th Cir. 1977), *aff'd in part, rev'd in part*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *Safeguard Mutual Insurance Co. v. Miller*, 472 F.2d 732, 734 (3d Cir. 1972); *Martin v. Wray*, 473 F.Supp. 1131, 1138 (E.D.Wis.1979). For these reasons, any ruling on the equitable requests for reinstatement of the plaintiffs, and the concomitant back pay for the period during which they have been demoted, is not made under the stringent concerns previously discussed.

Both parties understood, previous to trial and afterwards, that the decision for or against ordering reinstatement was peculiarly within the discretion of the trial court.[11] Equitable relief has traditionally been the province of the Court. While the Court indicated a preliminary intention of being guided by the jury's finding, the jury's verdict was merely advisory in this respect, not a mandatory finding that binds the Court. It was always accepted by the parties that the right to trial by jury did not extend to the right of reinstatement. *See Ross v. Bernhard*, 396 U.S. 531, 533, 90 S.Ct. 733, 735, 24 L.Ed.2d 729 (1970).

What plaintiffs did succeed in doing at trial was to establish a cause of action under Section 1983, despite the fact that the jury's findings preclude damages against the defendants involved. The proof of a § 1983 action, absent a claim of qualified official immunity requires only two elements: (1) That the defendants acted under color of state law, and (2) that a constitutional right has been denied. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970).

Since there was a violation, "an equity court possesses some discretionary power to award damages in order to do complete justice." *Walters v. Marathon Oil*, 7th Cir., 642 F.2d 1098 (1981), citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). In *Albemarle*, a Title VII case, the Court held that back pay should not be withheld without special reason. When a public employee is discharged in violation of his First Amendment or other constitutional rights, he is entitled to reinstatement and back pay.

---

11. The facts which gave birth to the claim for equitable relief were adjudicated by the jury. The plaintiffs are wholly incorrect when they state that this aspect of the case was tried by the jury. In fact, the plaintiffs had previously taken the position that had the jury found for the defendants, the district court, nevertheless, could order reinstatement and other relief independent of that verdict. To now make such an inconsistent argument does not advance their case.

*Eckerd v. Indian River School District*, 475 F.Supp. 1350, 1365 (D.Del.1979).

Weighing all of the competing interests in this case, all of the teachers in this consolidated case are ordered to be reinstated and given back pay, pursuant to the terms of the court's order.

This award is made in light of the testimony presented at trial, the verdict of the jury, and the interrogatory answers as interpreted by this Court. In equity, if other remedies are made available to the plaintiffs, this award would of necessity have to be fully reconsidered and evaluated. "[S]ince it is the historic purpose of equity to secure complete justice, the courts are able to adjust the remedies so as to grant the necessary relief, *Equal Employment Opportunity Commission v. General Tel. Co. of Northwest, Inc.*, 599 F.2d 322 (9th Cir. 1979), *aff'd*, [446 U.S. 318] 100 S.Ct. 1698, [64 L.Ed.2d 319] (1980) . . . ," quoted in *Walters v. Marathon Oil, supra*. This award is also in accordance with the principles of § 1983 relief.